[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 274.]

THE STATE OF OHIO, APPELLEE, *v*. HARTMAN, APPELLANT.

[Cite as *State v. Hartman*, 2001-Ohio-1580.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-1475—Submitted June 20, 2001—Decided October 3, 2001.)

APPEAL from the Court of Common Pleas of Summit County, No. CR97-09-1987.

_____

LUNDBERG STRATTON, J.

{¶ 1} In this appeal, defendant-appellant, Brett X. Hartman, raises thirteen propositions of law. Finding none meritorious, we affirm his convictions. We have also independently weighed the aggravating circumstance against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's convictions and sentence of death.

{¶ 2} Defendant met Winda Snipes at a bar in Akron, Ohio, sometime during 1997. Subsequently, they engaged in sexual intercourse on several occasions. During the late afternoon of September 9, 1997, defendant went to Snipes's apartment and brutally murdered her by tying her to the bed, stabbing her one hundred thirty-eight times, slitting her throat, and cutting off her hands.

{¶ 3} Defendant was convicted of aggravated murder, kidnapping, and tampering with evidence, and sentenced to death. In order to establish defendant's guilt, the state introduced statements defendant had made to the police and to a fellow inmate in jail, and the testimony of a co-worker that defendant mentioned cutting off a victim's hands as a way to eliminate evidence in the O.J. Simpson case. The state also introduced as evidence defendant's bloody tee-shirt and Snipes's watch recovered from defendant's apartment, and forensic testimony linking defendant to the murder.

***State's case***

**{¶ 4}** Around 2:20 a.m. on September 9, 1997, defendant met Snipes at the Bucket Shop, an Akron bar. Defendant kissed Snipes on the cheek and they talked. Thereafter, defendant and Snipes left the bar and they went to her apartment across the street.

**{¶ 5}** Around 3:00 a.m., David Morris, an acquaintance of defendant and Snipes, left the Inn Between, another Akron bar. While walking past Snipes's apartment on his way home, Morris observed Snipes and defendant through the upstairs window of her apartment. Morris testified that Snipes was yelling at defendant about touching stuff that was not his. Defendant closed the window blinds and "obviously she wasn't very happy about it" because she "scolded" him and reopened the blinds.

**{¶ 6}** That afternoon, at around 4:30 p.m., Snipes was observed crossing a street in a nearby business district. She was never seen alive again.

**{¶ 7}** Defendant had the day off from work on September 9. According to Richard Russell, a bartender at the Inn Between, defendant entered the bar at around 8:00 p.m. and appeared nervous and hyper, and talked excessively. Thereafter, defendant was in and out of the bar five to six times between 9:00 and 10:30 p.m.

**{¶ 8}** Defendant first contacted the police on September 9 with a series of anonymous 911 calls, which he later admitted to. His first 911 call at 9:59 p.m. reported the location of a mutilated body. The police officers dispatched to Snipes's address entered Snipes's apartment building and checked around, but left after finding nothing unusual. Meanwhile, defendant viewed the police unit's arrival and departure while hiding behind a tree across the street. Defendant then made another 911 call telling the police to return to the apartment building and provided further instructions on the body's location.

**{¶ 9}** Akron police officers responding to this call entered Snipes's unlocked apartment and found her naked, mutilated body lying on the bedroom

floor. Snipes's leg was draped across the bed, a pair of pantyhose tied her ankle to the bed leg, and a white plastic chair was on top of her body. Snipes's hands were cut off and have never been found.

{¶ 10} Around 10:45 p.m., defendant was at the Inn Between with Morris, while police units were across the street investigating Snipes's murder. Morris, having learned that Snipes had been murdered, suggested to defendant that he should talk to the police, since Morris had observed defendant at Snipes's apartment the previous evening.

{¶ 11} Shortly before midnight, defendant approached Detective Gregory Harrison while he was at a mobile crime lab parked outside Snipes's apartment. Defendant walked up to Harrison and said, "I hear it's pretty bad in there," and asked if Harrison had "ever seen anything so gruesome." Later that evening, defendant approached Harrison a second time and spontaneously mentioned that Snipes was a whore, "that she slept around a lot," and that "he had slept with her * * * and he had even slept with her the night before at 3:00." In their final contact at around 3:00 a.m., defendant was "kind of mumbling to himself" and Harrison heard defendant say that "she was a whore, she was a big whore, she got what she deserved."

{¶ 12} Between 11:30 p.m. and 12:15 a.m., defendant also approached Akron Police Lt. John A. Lawson near the murder scene and, "rather abruptly said, 'You're going to find my semen in her and my prints over there.' " When Lawson asked why, defendant said he "had been with her earlier that morning, the morning of the 9th," and that he had had sex with her.

{¶ 13} At 12:15 a.m. on September 10, defendant spoke to Detective Joseph Urbank in front of the apartment building. Defendant began their conversation by announcing that "he had sex with the victim the night before." Moreover, defendant said he did not know her name but "only knew her as psycho bitch and that

everybody knew that if you got drunk and were horny you went to go see her, you went to go see psycho bitch."

{¶ 14} Defendant also told Urbank that he went to Snipes's apartment at 2:30 a.m. on September 9, and "she started dancing a little bit." He "lifted her onto the bed, undressed her," and "they started having vaginal intercourse." Defendant said that he was disappointed because Snipes refused to have anal intercourse, and he left her apartment around 3:30 a.m. However, defendant claimed that he did not know anything about the murder until the bartender at the Inn Between told him about it on the evening of September 9.

{¶ 15} Around 6:00 a.m. on September 10, police took defendant to the Akron police station, where he was interviewed by Lawson and Urbank. During his interview, defendant denied making the 911 calls, and denied hiding behind a tree across from Snipes's apartment. Then, defendant changed a part of his story and admitted hiding behind a tree near the murder scene.

{¶ 16} Following the September 10 police interview, the police searched defendant's apartment with his consent. The police seized defendant's bloody tee-shirt from underneath the headboard of his bed, a pair of his jeans, and his boots. Police found a knife on his dresser and Snipes's wristwatch on defendant's bed stand.

{¶ 17} Police took defendant to the police station after the search of his apartment. While awaiting transfer to the Summit County Jail, defendant approached Detective John R. Gilbride and blurted out, "I was the one that called the police" and "I'm the one that found the body."

{¶ 18} Defendant told Gilbride he had been sexually involved with Snipes since February 1997, and had sexual intercourse with Snipes during the early morning hours of September 9. Defendant stated that "after having sex the psycho bitch threw him out of the apartment stating that her boyfriend was coming over." He left around 3:30 a.m. and returned to his own apartment.

4

{¶ 19} According to Gilbride, defendant said that he slept until 6:00 p.m. on September 9, and then took the bus to the Inn Between bar around 7:30 p.m. Gilbride testified that while going into the Inn Between bar, defendant noticed a light on in Snipes's apartment and decided to visit her. According to Gilbride, defendant gained entry to the apartment through an unlocked door and claimed that he found her dead body in her bedroom. Defendant said that he unsuccessfully tried to pick her body off the floor, noticed that her hands had been cut off, and "freaked out." Thinking "I'm going to get busted for this," defendant washed her blood off his hands and clothes, tried wiping down everything he touched, removed evidence linking him to her apartment, and went home.

{¶ 20} Snipes was stabbed one hundred thirty-eight times. Bruising on her ankles indicated that she was alive when she was tied to the bed. Additionally, sperm was found in her vagina and anus. The medical examiner concluded that Snipes had died from strangulation and a slit throat either in the late afternoon or early evening of September 9.

{¶ 21} Police found defendant's bloody fingerprint on the leg of the white chair draped over Snipes's body, and police found another of defendant's fingerprints on Snipes's bedspread. An expert witness testified that the long linear blood patterns found on defendant's tee-shirt and Snipes's bedspread were applied by a long-bladed knife. Further, the blood patterns found on defendant's tee-shirt were applied while the tee-shirt was lying flat, and not while defendant was wearing it.

{¶ 22} At trial, the prosecution introduced a set of defendant's knives, including a meat cleaver, a knife, and a knife sharpener that defendant kept at the Quaker Square Hilton, where he worked as a chef.

{¶ 23} Christopher Hoffman, a Hilton co-worker, testified that he talked to defendant in August 1997 about the O.J. Simpson trial. According to Hoffman, defendant said that Simpson could have disposed of evidence against him by cutting

off the victim's hands and eliminating "fibers and hair and skin that might be found on the fingernails."

{¶ 24} Bryan Tyson, a fellow inmate at the Summit County Jail, testified that during a jailhouse conversation, defendant admitted that he had killed Snipes. According to Tyson, defendant said that "he pushed himself on her, something in his mind snapped, she was hitting him, he lost his temper, did things he regretted, killed her." Then, defendant said that he had "tried to make it look like a burglary," admitted cutting off Snipes's hands, and mentioned a hacksaw, and jokingly said " 'Don't leave home without it,' like the credit card commercial."

### Defense case

{¶ 25} Jessica O'Neill, an acquaintance of defendant, talked on the phone with defendant on September 9. Phone records showed that O'Neill called defendant's apartment and spoke with him at 3:12 p.m. and 4:50 p.m. She also claimed that she talked with defendant on the phone around 6:30 or 7:00 p.m.

{¶ 26} The defense also introduced evidence suggesting an alternative suspect, Jeff Nichols. Nichols lived across the hallway from Snipes's apartment until he moved out of his apartment around September 1, 1997. Nichols worked as a handyman for the apartment building and had access to the landlord's keys to other apartments.

{¶ 27} In January 1997, Jeffrey Barnes, a friend of Snipes, was visiting Snipes's apartment when Nichols came to her door. According to Barnes, Nichols "got up right to her door and then he said, 'Slit the bitch's throat, cut her up,' and called her a slut and all other kind of vulgar names." Barnes reported this incident to the police upon hearing about Snipes's murder.

{¶ 28} On an evening prior to September 1, 1997, Linda Zarski, a neighbor in Snipes's apartment building, heard Snipes pounding on Nichols's door and screaming that she wanted her shirt.

{¶ 29} On another occasion prior to the murder, Linda Kinebrew, a neighbor living at the apartment, "heard [Nichols] arguing, telling [Snipes] to let him in and she wouldn't."

{¶ 30} Carol Parcell, defendant's mother, provided an alibi. Defendant lived at his mother's apartment, and Parcell claimed that when she came home on September 9 at 6:15 p.m., her son was sleeping in his bedroom. According to Parcell, defendant woke up at 7:00 p.m., got ready, left the apartment at 7:30 p.m., and returned to the apartment around 8:15 p.m.

{¶ 31} Defendant testified on his own behalf. He admitted having sex with Snipes several times over the past year and during the early morning hours of September 9 when he was at Snipes's apartment. After having sex, defendant returned to his apartment at about 3:30 a.m., slept until 6:15 p.m., left his apartment at 7:35 p.m., and returned to the Inn Between bar.

{¶ 32} Before reaching the Inn Between, defendant noticed that Snipes's bathroom light was on at her apartment, and he decided to visit her to see if he could "get laid." Defendant entered Snipes's apartment through an unlocked door and found her mutilated body in the bedroom. Defendant tried to "get her up and put her on the bed * * * to see if there was anything else I could help with."

{¶ 33} Defendant "freaked out" after noticing Snipes had no hands and realized he "could get in a lot of trouble" if he was placed at the scene. Thus, he washed her blood off his hands, wiped down the cupboards, chair handles, and anything else he might have touched, gathered whatever items he could find that belonged to him, and left Snipes's apartment. Defendant "ran home" and threw the items taken from Snipes's apartment into a nearby dumpster. Upon arriving home, defendant changed his shoes and hid the bloody tee-shirt so that his mother would not find it.

{¶ 34} Thereafter, defendant hurried back to the Inn Between bar and started drinking. When he was "semi-intoxicated," defendant made the

anonymous 911 calls reporting the location of Snipes's body, admitted standing behind a tree watching the police arrive at Snipes's apartment, and later approached the police to report that he had been at the apartment the previous evening.

{¶ 35} Defendant introduced photographs taken of his naked body following his arrest to show the absence of bruises and injuries. Defendant explained that a cut on his elbow had occurred at work while he was moving crates.

{¶ 36} Defendant acknowledged talking with Chris Hoffman about the O.J. Simpson case but did not recall discussing anything about cutting off a victim's hands.

{¶ 37} Defendant knew Tyson as a fellow inmate but denied making any jailhouse admissions that he murdered Snipes.

### Trial result

{¶ 38} The grand jury indicted defendant on two counts of aggravated murder, including one count of murder with prior calculation and design and one count of felony murder. A capital specification relating to murder during a kidnapping was included in the felony murder count. He was also charged with kidnapping and tampering with evidence.

{¶ 39} The jury found defendant guilty of all offenses and recommended death for Snipes's murder. The trial court sentenced defendant to ten years for kidnapping, five years for tampering with evidence, and death for the aggravated murder of Snipes.

{¶ 40} Defendant now directly appeals to this court as a matter of right.

### Sufficiency of the evidence

{¶ 41} In proposition of law I, defendant challenges the sufficiency of the evidence for the aggravated felony murder, the capital specification, and the separately charged kidnapping offense, all on the basis that the state had failed to prove kidnapping.

{¶ 42} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 43} The capital specification that defendant was convicted of was kidnapping: "committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping." R.C. 2929.04(A)(7). Defendant was also convicted of the separate offense of kidnapping Snipes. R.C. 2905.01, as charged in this case, prohibits using force, threat, or deception to remove a person from the place where she is found or restrain her liberty for purpose of facilitating the commission of a felony or flight thereafter, to terrorize or inflict serious physical harm, or to engage in sexual activity against her will. R.C. 2905.01(A)(2), (3) and (4).

{¶ 44} Defendant argues that in view of *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, the state failed to present sufficient evidence of either the elements of kidnapping or an animus separate from the aggravated murder to sustain his convictions on these charges.

{¶ 45} In *Logan*, we held that where murder is the underlying crime, "a kidnapping in facilitation thereof would generally constitute a separately cognizable offense." *Id*. at 135, 14 O.O.3d at 379, 397 N.E.2d at 1352. However, the test to determine whether the kidnapping was committed with a separate animus so as to support a separate conviction is whether "the restraint or movement of the victim is merely incidental to a separate underlying crime" or, instead, whether it

has a "significance independent of the other offense." *Id*. at syllabus; see, also, *State v. Simko* (1994), 71 Ohio St.3d 483, 488, 644 N.E.2d 345, 351.

{¶ 46} In *State v. Seiber* (1990), 56 Ohio St.3d 4, 564 N.E.2d 408, we found kidnapping where the defendant and his accomplice entered a bar with guns drawn, blocked the exit, and repeatedly ordered bar patrons to lie on the floor. The defendant then spent several minutes roaming the bar, threatening to kill several people. When one of the patrons refused to comply with the demands, the defendant shot and killed him. Under these facts, we held in *Seiber* that a jury could reasonably conclude that the defendant had restrained the murder victim of his liberty and that this evidence was sufficient to support the kidnapping charge.

{¶ 47} Here, the facts present more compelling evidence of kidnapping than in *Seiber*. Defendant tied Snipes to the bed, gagged her, stabbed her one hundred thirty-eight times, slit her throat, and strangled her to death. Moreover, bruising on Snipes's ankles established that she was alive when she was tied to the bed.

{¶ 48} The evidence therefore shows that Snipes's kidnapping, *i.e.,* the restraint, was completed prior to her murder and that the restraint was not merely incidental to her murder. Therefore, the prosecution presented sufficient evidence to prove not only kidnapping, but also an animus for kidnapping separate from Snipes's aggravated murder. Accordingly, we reject proposition I.

*Trial issues*

**{¶ 49}** *Other acts evidence.* In proposition of law III, defendant argues that the trial court erred in admitting "other acts" evidence in three instances.

**{¶ 50}** First, defendant claims that the trial court erred by permitting testimony about knives and the introduction of knives that were never connected to the murder. However, defendant's failure to object to this evidence at trial waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 62, 43 O.O.2d 119, 123, 236 N.E.2d 545, 549. See, also, *State v. Greer* (1988), 39 Ohio St.3d 236, 244, 530 N.E.2d 382, 394, applying the waiver rule to capital cases.

**{¶ 51}** The admission of defendant's knives rested upon a question of relevancy. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

**{¶ 52}** The police went to the Quaker Square Hilton where defendant worked as a chef and seized a set of knives belonging to him. At trial, the prosecutor introduced into evidence defendant's cutlery set consisting of a knife sharpener, a high carbon knife, and a meat cleaver.

**{¶ 53}** The admission of defendant's knives showed defendant's easy access to a possible murder weapon and his familiarity with using knives. Such evidence was particularly relevant, since Snipes was stabbed one hundred thirty-eight times, her throat was slit, and her hands were cut off.

**{¶ 54}** Moreover, the medical examiner's testimony suggested that the assailant probably knew what he was doing when he cut off the victim's hands. He pointed out that this "disarticulation is such that there is a cut right at the end of the bone, radius bone, * * * and the cut is such that bone itself was not sawed or cut.

There are ligaments in this area so that one can cut across the ligaments and the hand can be removed with just [a] few incisions."

{¶ 55} Thus, defendant's ownership of a set of knives and his familiarity and use of knives at work were relevant considering the surgical precision of the removal of Snipes's hands. Therefore, we reject any claim that this evidence constituted plain error.

{¶ 56} Defendant next claims that the trial court erred by allowing testimony about his prior DUI convictions. Detective John Gilbride was present when defendant was being held at the police station on September 10 awaiting transport to the county jail. Defendant and Gilbride began to talk. The prosecutor asked Gilbride the following question on direct examination:

"Q. Okay. So, then, what did he tell you about the morning of September 8th?

"A. He stated on the morning of September 8th he left his home to go to work at the Quaker Square Hilton. He states that he's a cook at that establishment and on this day he was working from nine to five.

"He states he rides the bus to and from work due to a previous DUI."

{¶ 57} However, the defense counsel failed to object to this evidence at trial, and waived all but plain error. *State v. Childs*, 14 Ohio St.2d at 62, 43 O.O.2d at 123, 236 N.E.2d at 549.

{¶ 58} Moreover, we find that this evidence supported the defense theory of the case and that any error was harmless. In his testimony, defendant emphasized that he was a heavy drinker and consumed large amounts of alcohol on September 8 and 9. Further, defendant testified that he had *several* DUIs and had actually lost his driver's license as a result.

{¶ 59} Defendant testified that his intoxication explains his behavior. For example, his intoxication explained why he approached police at the murder scene. According to defendant, "I started thinking that I was drunk when I was there [in

Snipes's apartment] and I was drunk that morning before, there's places that I touched all over the place that I don't remember; so I figured eventually they would find my fingerprints there."

{¶ 60} Here, defendant's admitted history of alcohol abuse, including his admission of having previous DUIs, was presented as an important part of his defense. Thus, Gilbride's testimony about defendant's DUI was not plain error.

{¶ 61} Finally, defendant claims that the trial court erred by allowing testimony that he had blood on his boots because he "face stomped" a black man six months before.

{¶ 62} The police found boot marks in Snipes's kitchen and bathroom and seized defendant's boots at the police station. When they took his boots, defendant asked, "What are they looking for, DNA?" Urbank said yes, and asked, "Would there be any reason that there would be any blood or hair on your boots?" Defendant said no, "except that he faced stomped a black guy six months ago."

{¶ 63} Since defendant did not object to this testimony, the defense waived all but plain error. *Id.* We find no plain error because of the compelling evidence of guilt. Moreover, this evidence was properly admitted because it demonstrated that defendant was concerned that the police would find blood on his shoes and he was trying to provide an alternate explanation.

{¶ 64} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

{¶ 65} Defendant changed his stories to police concerning his whereabouts and activities as the evidence mounted pointing to him as the murderer. For example, defendant initially denied hiding behind the tree across from Snipes's apartment and denied making the 911 calls to the police. But as evidence of his guilt mounted, he admitted doing both. In a similar vein, defendant's claim that he

"face stomped" a black man appears as a farfetched explanation to further deflect police suspicion that he killed Snipes. Such evidence helped to establish defendant's consciousness of guilt and was properly admitted. See *State v. Richey* (1992), 64 Ohio St.3d 353, 357, 595 N.E.2d 915, 921; *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226, 249.

{¶ 66} In conclusion, we find that the trial court did not commit plain error, and reject this proposition.

{¶ 67} *Fingerprint evidence*. In proposition of law IV, defendant challenges the admission of digitally enhanced fingerprint evidence. First, defendant claims that Patrick Warrick, the state's fingerprint expert, lacked the necessary expert qualifications to testify regarding such evidence. Second, defendant attacks the reliability of digitally enhanced fingerprint evidence.

{¶ 68} Patrick Warrick, a fingerprint examiner from the King County Sheriff's Office in Seattle, Washington, testified that by using digitally enhanced imaging, he concluded that a fingerprint found on Snipes's bedspread was defendant's fingerprint. However, Warrick also compared the fingerprints without using digitally enhanced imaging and reached the same conclusion.

{¶ 69} Defendant does not challenge Warrick's expert credentials as a general latent fingerprint examiner or Warrick's identification of defendant's print on the bedspread by traditional comparison of the prints. Moreover, the trial court properly admitted Warrick's expert opinion on digitally enhanced fingerprint evidence.

{¶ 70} In addition to the requirement of relevancy, expert testimony must meet the criteria of Evid.R. 702, which provides that a witness may testify as an expert if:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons * * *;

14

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 71} We find that the first prong of the rule was satisfied, since expert testimony was necessary to make fingerprint comparisons.  We find that the second prong of the test also satisfied, since defendant never challenged or objected to Warrick's expert qualifications at trial.  However, defense counsel did point out to the judge that Warrick's testimony was "blazing new ground" and that the scientific reliability of the digital enhancement method had not been established.  The trial court accepted the reliability of digitally enhanced fingerprint evidence, finding that "the use of the computer in this instance is no different than * * * would be the use of an overhead projector, microscope, a magnifying glass or anything else like that that would enhance an expert's ability to make his determination and therefore I find that there's nothing—no new trails being blazed here and I'm overruling the objection for that reason."

{¶ 72} We have designated four factors to be considered in evaluating reliability of scientific evidence: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance."  *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332, 1338-1339, citing *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735, 740.  However, it is important "to emphasize that none of these factors is a determinative prerequisite to admissibility."  *Nemeth* at 211, 694 N.E.2d at 1339, citing *Miller* at 612-613, 687 N.E.2d at 741.  See, also, *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 73} In this case, the third prong of the rule was satisfied, since digitally enhanced imaging meets Evid.R. 702(C)'s reliability standard.  Warrick testified

that the King County Sheriff's Office has used digitally enhanced fingerprint analysis for "approximately a year and a half." Other potential testimony establishing the reliability of digitally enhanced fingerprint evidence was not introduced because of the trial court's ruling that the method was in fact reliable.

**{¶ 74}** Moreover, in *State v. Hayden* (1998), 90 Wash.App. 100, 950 P.2d 1024, the court approved the admissibility of digitally enhanced fingerprint evidence utilizing the *Frye* standard.[1] See *Frye v. United States* (C.A.D.C.1923), 293 F. 1013. The *Hayden* court considered expert testimony, articles from forensic journals, and other matter in concluding that evidence obtained through digital imaging enhancement of latent fingerprints is "generally accepted in the relevant scientific community." *Id.* at 109, 950 P.2d at 1028. *Hayden*'s conclusion that digitally enhanced fingerprint evidence was admissible under the more stringent *Frye* standard supports our conclusion that digitally enhanced fingerprint evidence meets Evid.R. 702(C)'s reliability standard.

**{¶ 75}** We find that Warrick's testimony that defendant's fingerprint was found on Snipes's bedspread was properly admitted. Once properly before the court, the expert's conclusions became a matter for the trier of fact. *State v. Nemeth*, 82 Ohio St.3d at 211, 694 N.E.2d at 1339. Thus, we reject proposition IV.

**{¶ 76}** *Expert qualifications*. In proposition of law V, defendant claims that the trial court should not have allowed four of the state's expert witnesses to testify because the court failed to make a threshold determination concerning their qualifications.

**{¶ 77}** Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status upon

---

1. This court has consistently rejected the *Frye* "general acceptance" standard. *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 613, 687 N.E.2d 735, 741, fn. 1. But we consider *Hayden* to be relevant to the issue of reliability.

a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128, 133; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915.

{¶ 78} Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 148, 446 N.E.2d 444, 448. The issue arises from the following four expert witnesses.

{¶ 79} **James Wurster**. Wurster, a forensic scientist, had worked at the Ohio Bureau of Criminal Identification and Investigation ("BCI") since 1978. Wurster's educational qualifications included a master of science degree and course work at the Bloodstain Institute, the Serological Research Institute, and various FBI courses. He testified as to the presence of bloodstains on defendant's boot, his tee-shirt, and a chair leg from Snipes's apartment.

{¶ 80} While the state never formally tendered Wurster as an expert, defendant's counsel never objected or challenged his qualifications to testify. Thus, defendant waived all but plain error. Crim.R. 52(B); *State v. Baston*, 85 Ohio St.3d at 423, 709 N.E.2d at 133. We find no plain error and find that Wurster's experience as a forensic scientist qualified him to testify at trial about the presence of blood on various items.

{¶ 81} **Cynthia Mayle**. Mayle, a fingerprint examiner, worked for BCI since 1995. Her prior experience included work as a fingerprint examiner for the Cleveland and Philadelphia police departments. Mayle's educational background included a bachelor's degree from Cleveland State University and attendance at the advanced latent fingerprint course at the FBI Academy in Quantico. Mayle had

also lectured on fingerprint techniques at the FBI Academy. Mayle identified defendant's bloody palm print on a chair leg from Snipes's apartment.

{¶ 82} Although Mayle was not formally tendered as an expert, defendant did not object to her qualifications, and waived all but plain error. *Id.* We find no plain error and find that Mayle was fully qualified to expertly testify that defendant's palm print was found on Snipes's chair leg.

{¶ 83} **Patrick Warrick**. As discussed earlier, Warrick, a latent fingerprint examiner, identified defendant's fingerprint on Snipes's bedspread. Warrick has a bachelor's degree in criminology along with "numerous courses in crime scene investigation, latent print development, latent print processing, latent print comparisons, crime scene photography, [and] evidence photography." Warrick's experience as a latent fingerprint examiner included employment with the Long Beach and Santa Monica, California police departments (over eight years' total), and his current employment with the King County, Washington Sheriff's Department (five and a half years).

{¶ 84} Although Warrick was not formally tendered as an expert witness, defendant's objections to Warrick's expert testimony did not challenge Warrick's qualifications. On that point, he waived all but plain error. *Id.* We find no plain error and also find that Warrick was qualified to identify defendant's fingerprint on Snipes's bedspread.

{¶ 85} **Rod Englert**. Englert, a forensic consultant, testified that long linear blood patterns found on defendant's tee-shirt and Snipes's bedspread were applied by a long-bladed knife. Moreover, the blood transfers were applied while the tee-shirt was lying flat, and not while defendant was wearing it.

{¶ 86} Englert's educational qualifications included a bachelor of science degree, graduation from the FBI Academy, and completion of postgraduate work at two universities. Englert's experience included more than twenty-five years as a police homicide investigator. Following his retirement from law enforcement,

Englert became a consultant in crime scene reconstruction and blood pattern evidence. Englert has lectured on these topics "around the world over 530 times for the last 25 years in this subject," he has published articles on crime scene reconstruction, and he has "testified in the United States about 230 times as an expert."

**{¶ 87}** As with other experts in this case, the state did not formally tender Englert as an expert. However, the trial judge found that Englert was "certainly qualified as an expert" when he overruled a defense objection to a blood spatter demonstration in the courtroom.

**{¶ 88}** Defendant's counsel entered *general* objections to Englert's opinion that a long-bladed knife likely caused the blood transfer stains found on defendant's tee-shirt and Snipes's bedspread and Englert's opinion that the tee-shirt was not being worn when the blood transfer stains were applied. The court overruled the first two objections and sustained the third. The prosecutor rephrased the question, and the testimony proceeded without question.

**{¶ 89}** Defendant's counsel also objected to Englert's opinion "regarding the freshness of blood," since "[h]e hasn't acquired a pathology or doctor's degree" and such testimony is not "within his expertise." The trial court overruled this objection "because it's not for the purpose of medical diagnosis."

**{¶ 90}** Under Evid.R. 702(B), an expert may be qualified by *specialized knowledge, skill, experience, training, or education* to give an opinion that will assist the jury to understand the evidence and determine a fact at issue. See *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891, 912-913 (eleven years' experience as a forensic scientist in bloodstain analysis was sufficient qualifications for blood spatter testimony).

**{¶ 91}** Although Englert was not a medical doctor, the trial court did not abuse its discretion in allowing him to testify as an expert because of his extensive background and experience in bloodstain analysis. See *State v. Wogenstahl* (1996),

75 Ohio St.3d 344, 362, 662 N.E.2d 311, 326 (forensic serologist's testimony on blood stain analysis permitted although witness was neither a college graduate nor a medical doctor). Cf. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 107 (error to allow expert opinion where witness "frankly admitted that he was not an accident reconstructionist; that he never had the opportunity to work with an accident reconstructionist; and further, that he had never conducted an accident reconstruction"). Moreover, " '[i]t is a general rule that the expert witness is not required to be the best witness on the subject. * * * The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth.' " *State v. Tomlin* (1992), 63 Ohio St.3d 724, 728, 590 N.E.2d 1253, 1257, quoting *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566.

{¶ 92} We find that although Englert was not formally tendered as an expert in crime scene reconstruction and bloodstain and blood spatter analysis, Englert's education and experience qualified him to provide expert testimony on blood transfers and the freshness of blood. Even though Englert was not a medical doctor, the trial court did not err in permitting Englert's expert testimony. Thus, we reject proposition V.

{¶ 93} *Gruesome photographs*. In proposition of law VIII, defendant argues that the trial court erred in admitting gruesome photographs of the victim, since the prejudicial effect outweighed their probative value. However, defendant fails to specify which photographs were objectionable or exactly why they were inadmissible. The record shows that the trial court admitted several graphic crime scene photos of Snipes's body and various autopsy photos.

{¶ 94} The defense counsel objected to the gruesome photographs in a motion before trial and renewed the objections at trial. The trial court overruled these objections.

**{¶ 95}** In capital cases, nonrepetitive photographs, even if gruesome, are admissible if relevant and of probative value as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267, 273-274. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916, 923.

**{¶ 96} Crime scene photographs**. State's exhibits 28, 29, 30, and 35 were photographs taken at different angles showing the chair draped over Snipes's body. State's exhibit 34 was a distance shot taken across Snipes's bed showing her body on the opposite floor. State's exhibit 33 shows Snipes's body with her left hand cut off. State's exhibits 32 and 37, which were decidedly gruesome, show Snipes's body with a gag in her mouth and both hands cut off.

**{¶ 97}** These photos illustrated the testimony of the detective at the scene, portrayed Snipes's body in relation to her surroundings, and helped to prove the killer's intent and lack of accident or mistake. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251, 1262; *State v. Mason* (1998), 82 Ohio St.3d 144, 158, 694 N.E.2d 932, 949. Moreover, the photos at the crime scene supported the prosecution theory that Hartman brutally murdered Snipes in a fit of rage. The photos also corroborated Hoffman's testimony that defendant discussed cutting off a victim's hands to eliminate evidence that might be found under the victim's fingernails.

**{¶ 98}** We find that no error was committed in admitting these photos, since the probative value of each photograph outweighed any prejudice to the accused.

**{¶ 99} Medical examiner's photographs**. State's exhibits 82-84 and 96 present closeups and different angles of Snipes's head, throat, and chest showing her slit throat, stab wounds, and other injuries. They supported the medical

examiner's testimony as to cause of death. State's exhibit 85 shows the numerous stab wounds on Snipes's torso, State's exhibit 87 portrays bruising and wounds on her lower extremities, and State's exhibit 88 presents an "X" mark carved into Snipes's back, which the prosecution suggested represented defendant's middle initial. State's exhibit 89 presents a full-body view of wounds on Snipes's back and lower extremities and State's exhibit 90 shows stab wounds on the side of her back. State's exhibits 91-93 show cuts on Snipes's legs and bruising on her ankle indicating that she was alive when defendant tied her to the bed. Finally, State's exhibits 94 and 95 portray the stumps of her wrists and show how her hands were cleanly cut off. Photos of Snipes's wrist stumps supported testimony showing that defendant was familiar with using knives as a chef and accounted for his near-surgical removal of Snipes's hands.

{¶ 100} The trial court did not err in admitting these photos. The fourteen autopsy photos illustrated the medical examiner's testimony and demonstrated defendant's specific intent to kill. *State v. Goodwin*, 84 Ohio St.3d at 342, 703 N.E.2d at 1262; *State v. Mason*, 82 Ohio St.3d at 159, 694 N.E.2d at 949. Snipes was stabbed one hundred thirty-eight times all over her body, her throat was slit, her hands were cut off, and her ankles and other areas of her body were bruised. In this case, multiple injuries required multiple photographs. Thus, we find that the trial judge did not abuse his discretion in admitting these photographs. See, *e.g.*, *State v. Smith* (1997), 80 Ohio St.3d 89, 108-109, 684 N.E.2d 668, 687-688; *State v. Biros*, 78 Ohio St.3d at 443, 678 N.E.2d at 907; *State v. Joseph* (1995), 73 Ohio St.3d 450, 460, 653 N.E.2d 285, 294. Thus, we reject proposition VIII.

{¶ 101} *Guilt phase instructions*. In proposition of law XII, defendant challenges the trial phase instructions on the kidnapping specification. Defendant argues that the trial court erred in failing to instruct the jury that they must find that he purposely removed or restrained Snipes.

{¶ 102} Defendant, however, failed to object at trial or request specific instructions and thus waived all but plain error. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. The alleged deficiency did not cause a different trial result or create a manifest miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. We find no plain error. Additionally, we find that defendant suffered no prejudice from the court's instructions.

{¶ 103} R.C. 2905.01(A) requires the state to show that the kidnapping involved a purposeful removal or restraint. *State v. Avery* (1998), 126 Ohio App.3d 36, 48, 709 N.E.2d 875, 883; see, also, *State v. Maurer*, 15 Ohio St.3d at 270, 15 OBR at 406, 473 N.E.2d at 796.

{¶ 104} R.C. 2905.01 provides:

"(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following *purposes:*

"* * *

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or to inflict serious physical harm on the victim or another;

"(4) To engage in sexual activity * * * with the victim against the victim's will." (Emphasis added.)

{¶ 105} In the case *sub judice,* the trial court's kidnapping instructions omitted any explicit reference to "purpose." But the trial court's instructions on kidnapping in the capital specification used the words "to facilitate" as follows:

"Kidnapping is the use of force, threat, or deception to remove a victim from the place where he or she is found and/or restraining the liberty of such person *to facilitate* the commission of any felony or flight thereafter, and/or to terrorize or inflict the commission of any felony or to inflict serious physical harm on the victim

and/or to engage in sexual activity with the victim against her will." The trial court's instructions on the separately charged offense of kidnapping included the same type of wording.

{¶ 106} While the trial court's instruction deviated from the purposeful language in the kidnapping statute, the instruction was not misleading and defendant was not prejudiced. "Facilitate" is defined as "to make easier or less difficult: free from difficulty or impediment [as in] to facilitate the execution of a task[;] * * * to lessen the labor of (as a person): assist, aid." Webster's Third New International Dictionary (1986), at 812. A commonsense understanding tells us that the terms "for any of the following purposes" and "to facilitate" essentially have the same meaning. Further, there was compelling evidence of defendant's guilt in the kidnapping (*i.e.,* that defendant forcefully tied Snipes to her bed to facilitate, or for the purpose of, brutally terrorizing and murdering her). Moreover, the defense did not object to these instructions, and any deficiency did not amount to outcome-determinative plain error. Thus, we reject proposition XII.

*Penalty phase issues*

{¶ 107} **Penalty phase instructions**. In proposition of law II, defendant objects to three of the trial court's penalty phase instructions.

{¶ 108} First, defendant argues that the trial court erred in instructing the jury to "weigh against the aggravating circumstances the nature and circumstances of the offense * * *." Indeed, defendant submitted a pretrial motion requesting the trial court not to give this instruction, since there was nothing mitigating about the nature and circumstances of the offense.

{¶ 109} R.C. 2929.04(B) states that the jury "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense * * *." We find that the trial court's instruction was proper.

{¶ 110} Second, defendant argues that the trial court's instructions did not comport with this court's decision in *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, in two ways. First, he objects to the following instruction:

"Should the jury's recommendation be that the death sentence be imposed, the Court must review and evaluate such recommendation and if the Court finds beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, the Court shall then impose the sentence of death.

"On the other hand, if after considering all of the evidence raised at trial which is relevant to the issues before you, * * * you cannot unanimously agree that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances, as I have defined them, outweigh the mitigating factors, then you'll return your recommendation reflecting that decision.

"In this event, you will then proceed to determine which of the three possible life imprisonment sentences to impose."

{¶ 111} Defendant asserts that the instruction given by the trial court required the jury to unanimously rule out the death penalty before considering a life sentence in violation of *State v. Brooks*, *supra.* In *Brooks*, the trial court charged the jury that " '[y]ou are now required to determine unanimously that the death penalty is *inappropriate before* you can consider a life sentence.' " (Emphasis added.) *Id.*, 75 Ohio St.3d at 159, 661 N.E.2d at 1040. *Brooks* found error because the trial court's instructions conflicted with R.C. 2929.03(D)(2). *Id*.

{¶ 112} In a pretrial motion, defendant objected to any "acquittal first" type of penalty phase instructions and requested a clarifying instruction stating that "[y]ou are not required to determine unanimously that the death sentence is inappropriate before [you] consider the life sentences."

{¶ 113} Contrary to defendant's contention, the trial court never instructed the jury that it had to unanimously reject the death penalty before it could consider a life sentence. The instructions explicitly advised the jurors that if they were

SUPREME COURT OF OHIO

unable to unanimously agree to recommend death, they shall consider life sentences. The jury was thus implicitly advised that a single juror could prevent the death penalty. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 294, 731 N.E.2d 159, 174-175. We find that this instruction was proper.

{¶ 114} Defendant also argues that the trial court erred by failing to give the "lone-juror instruction" mandated in the *Brooks* case. In *State v. Brooks*, 75 Ohio St.3d at 162, 661 N.E.2d at 1042, trial courts were told to explicitly instruct juries that a single juror "may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." Here, the trial court erred by not explicitly giving the jury this instruction. However, the trial court's instructions were consistent with R.C. 2929.03(D)(2), and we find no prejudicial error. See *State v. Stallings*, 89 Ohio St.3d at 294, 731 N.E.2d at 174-175.

{¶ 115} Moreover, defendant failed to object to the lack of a lone-juror instruction at trial and waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; see, also, *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. We find that no plain error resulted from the trial court's failure to give this instruction and, thus, reject this argument.

{¶ 116} As the third instructional error, defendant argues that the trial court erred by not instructing the jury as to the limited purpose of victim-impact testimony. Defendant's counsel objected very generally to the state's victim-impact testimony, but he did not request limiting instructions. Thus, defendant waived all but plain error. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 679, 687 N.E.2d 1358, 1369.

{¶ 117} Ella Snipes, the victim's mother, provided victim-impact testimony. Mrs. Snipes briefly discussed the victim's early life in North Carolina, the victim's schooling, her close-knit family, and the victim's contact with family

26

after moving to Akron. Mrs. Snipes summed up the family impact of the victim's death by saying, "[I]t's been around nine months now since our daughter Winda was brutally murdered. It has been an extremely bad time for us and will be from now on. She'll never leave our heart." Mrs. Snipes expressed no opinion about the penalty.

{¶ 118} Victim-impact testimony does not violate constitutional guarantees. See, generally, *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720. This court has permitted victim-impact testimony in capital cases when the testimony, as it was here, was not overly emotional or directed to the penalty to be imposed. See *State v. Reynolds*, 80 Ohio St.3d at 679, 687 N.E.2d at 1369; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 650 N.E.2d 878.

{¶ 119} Here, it cannot be said that the sentence clearly would have been otherwise but for the lack of instructions regarding victim-impact evidence. See *State v. Reynolds* at 679, 687 N.E.2d at 1369. Thus, we reject proposition II.

### *Prosecutorial misconduct*

{¶ 120} In proposition of law VI, defendant complains about several instances of prosecutorial misconduct.

{¶ 121} First, defendant argues that prosecutorial misconduct occurred when the state called Kathryn Snipes-Gaskey, the victim's sister, and she improperly presented victim-impact testimony as the first prosecution witness during the guilt phase. However, the defense counsel did not object to Snipes-Gaskey's testimony at trial, and thus waived all but plain error. *State v. Tibbetts*, 92 Ohio St.3d at 160-161, 749 N.E.2d at 248.

{¶ 122} Snipes-Gaskey identified the victim's wristwatch seized from defendant's apartment. As a preliminary matter, Snipes-Gaskey described her close personal relationship with the victim, discussed her familiarity with the victim's jewelry, and remembered the wristwatch because their mother purchased the watch for the victim "around Christmas of 1995."

{¶ 123} Snipes-Gaskey provided additional testimony describing Snipes's upbringing, schooling, employment history, her move to Akron in May 1996, and her last trip home in July 1997. Snipes-Gaskey also mentioned the victim's close family ties, discussed their last phone conversation two days before Snipes's murder, and mentioned that their parents and grandmother received a final letter from the victim in the mail following Snipes's murder. Snipes-Gaskey also presented a collage showing photographs of the victim and the victim with her family.

{¶ 124} Snipes-Gaskey's identification of the victim's wristwatch was crucial in identifying defendant as the murderer, since the wristwatch was likely stolen by the person who cut off Snipes's hands. Preliminary testimony depicting Snipes-Gaskey's relationship with the victim and her familiarity with Snipes's jewelry laid the foundation for her identification of the victim's wristwatch, and this testimony was admissible.

{¶ 125} Snipes-Gaskey's testimony about the victim's employment history, their final phone call, the victim's final letter to her grandmother, and the introduction of the collage was victim-impact evidence of questionable relevance. Cf. *State v. Fautenberry*, 72 Ohio St.3d at 440, 650 N.E.2d at 882-883. Given the fact that Snipes-Gaskey's testimony was "not overly emotional or directed to the penalty to be imposed, it cannot be said that the sentence would clearly have been otherwise but for the victim-impact evidence." See *State v. Reynolds*, 80 Ohio St.3d at 679, 687 N.E.2d at 1369. Thus, we find that the admission of Snipes-Gaskey's testimony was not plain error.

{¶ 126} Second, defendant argues that prosecutor's closing argument during the penalty phase was improper. Defendant's first example of the prosecutor's improper argument includes the following: "Because certainly Winda Snipes is not here to talk about, you know, her feelings and what she went through

28

those last minutes of her life. So, the information from her mother is permitted for your consideration."

{¶ 127} However, defendant failed to object to this argument and waived all but plain error. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 128} The prosecutor erred in inviting the jury to concentrate on what the victim experienced and was feeling in her last moments of life. As recognized in *State v. Wogenstahl*, 75 Ohio St.3d at 357, 662 N.E.2d at 322-323, citing *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077, such argument improperly "invites the jury to speculate on facts not in evidence." Although error, we find that the prosecutor's brief remarks do not rise to the level of outcome-determinative plain error.

{¶ 129} Defendant also claims that the prosecutor committed misconduct during the following segment of his penalty phase argument: "[T]he Judge is going to tell you [what] the law is, but I anticipate that, against those aggravating circumstances you weigh the nature and circumstances of this offense." Again, defendant failed to object to this segment of the argument, and waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 130} Under R.C. 2929.04(B), the jury must weigh proven aggravating circumstances against the nature and circumstances of the offense as a potential mitigating factor. See *State v. Wogenstahl*, 75 Ohio St.3d at 361, 662 N.E.2d at 325; *State v. Lindsey* (2000), 87 Ohio St.3d 479, 486, 721 N.E.2d 995, 1004. Accordingly, we find that this segment of the prosecutor's argument did not involve misconduct.

{¶ 131} Defendant also argues that the prosecutor committed misconduct during this portion of his penalty phase closing argument: "I think you certainly can consider as a part of the aggravating circumstance this Defendant's actions after the

murder, removing of evidence, trying to wipe down the scene, letting the mutilated body of Winda Snipes lay for several hours before * * * the police are called, fleeing after the commission of a crime. Those kinds of actions can also by considered by you." The trial court overruled the defense counsel's objection to these comments.

{¶ 132} Here, the kidnapping specification was the only aggravating circumstance that the jury could consider during the penalty phase. Thus, it was wholly improper for the state to argue or suggest that the jury may consider the nature and circumstances of the offense as "part of the aggravating circumstance." See *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311, 321, paragraph one of the syllabus.

{¶ 133} The test for prejudice regarding prosecutorial misconduct in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, 1254, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. Here, the prosecutor's improper argument could not have made any difference in the outcome of the trial, particularly in light of the statutory aggravating circumstance defendant was found guilty of committing and the lack of compelling mitigating evidence. Cf. *State v. Wogenstahl*, 75 Ohio St.3d at 360, 662 N.E.2d at 324.

{¶ 134} Moreover, the trial court properly instructed the jury that the only aggravating circumstance in this case was the kidnapping specification. The instruction was very clear in this regard, and we can assume that the jury followed the trial court's instructions. *Id.* at 360, 662 N.E.2d at 324-325. Also, our independent reassessment of the sentence can cure this error. *State v. Hill* (1996), 75 Ohio St.3d 195, 210, 661 N.E.2d 1068, 1082. Thus, we reject this complaint.

{¶ 135} Finally, defendant argues that the prosecutor committed misconduct by improperly introducing victim-impact evidence before the defense opened the door to its admission. However, the state's introduction of relevant

victim-impact testimony is not limited to refuting or rebutting mitigation evidence that the defense has first introduced. See, generally, *State v. Fautenberry*, 72 Ohio St.3d at 440, 650 N.E.2d at 883; *State v. White* (1999), 85 Ohio St.3d 433, 446, 709 N.E.2d 140, 154. We find that the testimony was relevant to guilt. Therefore, we reject this argument.

{¶ 136} In summary, we find no prosecutorial misconduct justifying reversal and we reject proposition VI.

### *Ineffective Assistance of Counsel*

{¶ 137} In proposition of law VII, defendant raises multiple instances of ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

### *1. Concession during final argument in the penalty phase*

{¶ 138} Defendant argues his defense counsel was ineffective during final argument in the penalty phase by conceding that "[t]here's nothing I can do, nothing we can say, no evidence we can put on to reduce the blame that you've already ascribed." Defendant claims that by making this concession about blame, his counsel totally foreclosed any opportunity to avoid the jury's imposition of the death sentence.

{¶ 139} In the instant case, it may appear that defense counsel "conceded blame" during the penalty phase of the trial, but this was after guilt had already been determined. There was, in fact, nothing counsel could do to change the jury's finding of guilt. A reading of the transcript reveals, moreover, that counsel was merely explaining to the jury that the guilt phase and penalty phases are separate. Counsel merely noted that the jury had already convicted his client and found that

he was guilty of the murder and that counsel was now moving beyond that fact to focus the jury's attention on mitigating factors. Here, his defense counsel forcefully argued throughout his summation that the mitigating factors justified imposition of a life sentence. Counsel's tactical decision conceding blame maintained the defense's credibility and allowed counsel to focus the jury's attention on mitigating factors supporting a life sentence. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 40, 553 N.E.2d 576, 595 (counsel not ineffective for conceding guilt in closing argument during the penalty phase). Thus, we find no error in counsel's argument.

### 2. *Failure to object to expert testimony*

{¶ 140} Defendant argues that his counsel were ineffective by failing to object to Englert's opinion on blood-transfer evidence, since Englert did not testify that his opinion was based upon a reasonable degree of scientific certainty. Further, defendant argues that his counsel should have cross-examined Englert on his inadequate expert qualifications.

{¶ 141} Englert provided his opinion on blood-transfer stains found on defendant's tee-shirt and Snipes's stuffed toy rabbit after being asked by the prosecutor if he had formed his opinion to "a reasonable degree of scientific certainty." During the same series of questions, the prosecutor asked Englert for three more opinions on blood-transfer stains and the freshness of blood without first asking Englert whether his opinion was based on a "reasonable degree of scientific certainty."

{¶ 142} Defense counsel were not ineffective by failing to object to these follow-up questions. After the prosecutor's first questions, defense counsel could reasonably conclude that Englert would continue to give opinions based on a reasonable degree of scientific certainty. Further objections by defense counsel would only further emphasize the scientific certainty of the witness's testimony.

{¶ 143} The failure to object to error, alone, is not enough to sustain a claim of ineffectiveness. "Because '[o]bjections tend to disrupt the flow of a trial, [and]

32

are considered technical and bothersome by the fact-finder,' Jacobs, Ohio Evidence (1989), at iii-iv, competent counsel may reasonably hesitate to object in the jury's presence." *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, 352. Thus, we find that counsel made a legitimate "tactical decision" by not objecting to Englert's further answers and that this decision was not ineffective.

{¶ 144} Defendant also argues that his counsel were ineffective by failing to cross-examine Englert on his expert qualifications. Contrary to defendant's assertions, Englert's qualifications were extremely strong. Englert graduated from the FBI Academy at Quantico, he had completed postgraduate work at the University of Virginia, and he had twenty-five years of experience as a police homicide investigator, retiring as chief detective. He has lectured all over the world, including at Scotland Yard. He is a published author on crime scene reconstruction and has been teaching for twenty-five years at the Southern Police Institute. He has testified over two hundred times as an expert. By not cross-examining Englert on his background and experience, defense counsel avoided inviting the prosecutor to ask followup questions that might bolster Englert's qualifications even more in the eyes of the jury. Again, we find that counsel made a legitimate tactical decision and were not ineffective. See *State v. Jones* (2001), 91 Ohio St.3d 335, 354, 744 N.E.2d 1163, 1183.

{¶ 145} Defendant also claims that his counsel were ineffective by failing to object to Warrick's expert testimony, since this was the first time that Warrick had ever testified using digitally enhanced fingerprint evidence. Further, defendant attacks counsel's failure to object to Warrick's testimony because his written report never stated that the information he utilized was sufficient for him to form an opinion. He also argues that counsel were ineffective for never objecting during Warrick's testimony that his conclusions were not based on a reasonable degree of scientific certainty.

{¶ 146} During cross-examination, Warrick admitted that this was the first time he had ever testified using digitally enhanced fingerprint evidence. In this instance, counsel's effective cross-examination exposed Warrick's inexperience in testifying about digitally enhanced fingerprint evidence. The jury was properly instructed that they were to decide what weight to give such evidence. See *State v. Jones* (2000), 90 Ohio St.3d 403, 416, 739 N.E.2d 300, 315. We reject this claim of ineffective assistance.

{¶ 147} Defendant's attack on counsel's failure to object to the inadequacy of Warrick's testimony cannot be evaluated, since Warrick's January 9, 1998 report was never presented at trial. Moreover, defendant cannot add to the record, since "[a] reviewing court cannot add matter to the record before it * * * and then decide the appeal on the basis of the new matter." *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus.

{¶ 148} We also find that defendant's attack on counsel's delay in objecting to Warrick's testimony lacks merit. At the conclusion of Warrick's testimony, counsel moved to strike his testimony because it was not based on a reasonable degree of scientific certainty. As previously discussed, the trial court properly overruled counsel's motion. Moreover, we find that counsel's delay in objecting to Warrick's testimony was a "tactical decision," and reject this claim of ineffectiveness. See *State v. Smith* (2000), 87 Ohio St.3d 424, 441, 721 N.E.2d 93, 111.

### 3. *Failure to object to Urbank's and Hoffman's testimony*

{¶ 149} Defendant argues that counsel was ineffective because his counsel failed to object to Urbank's testimony that defendant said that "he face stomped a black guy six months ago." Since this testimony was properly admitted, counsel's failure to challenge such evidence cannot be considered ineffective assistance.

{¶ 150} Assuming that such testimony should not have been introduced, any such deficiency constitutes reversible error only where "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Here, compelling evidence of defendant's guilt was presented during his trial and the jury's consideration of this improper comment would not have changed the outcome of the case. Therefore, we reject this claim of ineffectiveness.

{¶ 151} Defendant also asserts counsel's ineffectiveness for failing to object to Christopher Hoffman's testimony. Hoffman, one of defendant's co-workers at the Hilton, testified that defendant mentioned during a conversation in August 1997 that O.J. Simpson could have cut off the victim's hands and eliminated skin and fiber evidence from the victim's nails.

{¶ 152} Hoffman's testimony was admissible in establishing defendant's identity as the murderer. Evid.R. 401; see, also, *State v. Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Defendant's comments about cutting off a victim's hands implicated defendant as Snipes's murderer, since Snipes's hands were cut off. In addition, defendant's comments were made just a month before the murder and tended to prove "prior calculation and design." See R.C. 2903.01(A).

{¶ 153} Thus, we find that counsel's failure to object was not ineffective.

### 4. Failure to utilize DNA evidence

{¶ 154} Defendant argues that his counsel were ineffective for failing to utilize DNA evidence to establish that defendant's semen was not present in Snipes's anus.

{¶ 155} Urbank testified that defendant had told him that he had only vaginal intercourse with Snipes on September 9, although he "had first asked her when they were going up to the apartment if he could have anal intercourse with her and she said yes but later she said no and he was disappointed because they

didn't have any." At trial, defendant repeated that he had "[j]ust regular vaginal sex," and no anal sex.

**{¶ 156}** Platt, the medical examiner, testified that sperm was found in the victim's anus. The state conducted no DNA testing. According to Wurster, a BCI forensic scientist assigned to the DNA section, he recommended against DNA testing on the semen because "I was given information that the Defendant never denied having sex and DNA would do nothing more than confirm that that was the case." Moreover, the Akron police did not request DNA testing of the semen, and Wurster was never informed that defendant denied having anal sex with the victim.

**{¶ 157}** The defense theory was that someone else had had anal sex with Snipes and killed her on September 9. Thus, defendant claims that his counsel were ineffective for failing to utilize DNA testing to show that his semen was not in Snipes's anus.

**{¶ 158}** As an initial matter, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225, 230, citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407, 417. Thus, the defense counsel's decision to rely on cross-examination should be viewed as a legitimate "tactical decision" particularly since the results of a DNA examination may not necessarily have proven favorable for the defense. See *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, 108.

**{¶ 159}** Finally, resolving this issue in defendant's favor would be purely speculative. "Nothing in the record indicates what kind of testimony an * * * expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal." *State v. Madrigal* (2000), 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52, 65 (rejecting claim of ineffectiveness for counsel's failure to utilize an expert on eyewitness identification); *State v. Carter*

(2000), 89 Ohio St.3d 593, 606, 734 N.E.2d 345, 357 (rejecting claim of ineffectiveness for counsel's failure to pursue MRI testing in the penalty phase). Thus, we reject defendant's claim that counsel's failure to utilize DNA evidence constituted ineffective assistance of counsel.

### 5. *Failure to obtain expert testimony on bloodstain*

{¶ 160} Defendant  argues counsel's ineffectiveness for failing to obtain expert testimony concerning a bloodstain found on his right boot.

{¶ 161} Wurster testified that he found a small bloodstain on one of defendant's boots.  However, Wurster conducted no confirmatory testing to determine whether the blood stain matched the defendant's or the victim's blood type, or even whether it was human or animal blood.  Thus, defendant argues that his counsel were ineffective for failing to present expert testimony to establish that the bloodstain found on his boot was animal blood or that it came from the "face stomping" incident or elsewhere.

{¶ 162} The bloodstain on defendant's boot was not an issue in the case, since he admitted that the police "would find the blood of the victim on them." Moreover, defendant admitted on the stand that he was at Snipes's apartment and tried to lift her bloody corpse from the floor to the bed, got blood on his hands from trying to lift her body, and ran to the bathroom and began washing all the blood off his hands in the bathtub.  Thus, blood could obviously be found on his boots. Counsel could have determined that pursuing testing in light of this evidence was not a wise use of time and resources.  Counsel exercised a legitimate tactical decision by not pursuing this questionable line of defense.  Thus, we reject this claim.

### 6. *Failure to conduct meaningful voir dire*

{¶ 163} Defendant claims that his counsel were ineffective for failing to adequately voir dire prospective jurors because counsel generally inquired only about the jurors' ability to be fair and impartial.  However, defendant fails to specify

which prospective jurors were improperly questioned, or how counsel's questioning prejudiced his case.

{¶ 164} " 'The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' " State *v. Smith*, 87 Ohio St.3d at 440, 721 N.E.2d at 110, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Moreover, this court "will not second-guess trial strategy decisions" such as those made in voir dire, and " 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Mason*, 82 Ohio St.3d at 157-158, 694 N.E.2d at 949, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; see, also, *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144, 1153.

{¶ 165} As to defendant's claim of ineffective assistance in regard to voir dire, defendant fails to establish prejudice, namely, "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Thus, we find that this claim has no merit.

### 7. *Failure to object to prosecutorial misconduct*

{¶ 166} Defendant recasts his objections to prosecutorial misconduct into ineffective assistance of counsel without showing why counsel's failure to object made his performance deficient or how reasonably probable that, but for counsel's errors, the result of the trial would be different. *Id.* However, " '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.' " *State v. Fears* (1999), 86 Ohio St.3d 329, 347, 715 N.E.2d 136, 153, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, 837. Since defendant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial, we reject this claim.

### 8. *Failure to object to trial and penalty phase instructions*

**{¶ 167}** Defendant argues that counsel's failure to object to the trial and penalty phase instructions constituted ineffectiveness. However, defendant fails to specify the instructions that he believes counsel should have objected to as erroneous.

**{¶ 168}** Earlier in this opinion, we found no merit in defendant's allegations of instructional error during either the trial or penalty phase of the trial. Here, defendant similarly fails to demonstrate how counsel's failure to object was deficient performance or how "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would be different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Since counsel's performance did not fall below an objective standard of reasonableness and defendant did not suffer prejudice, we reject this claim of ineffectiveness. See *State v. Madrigal*, 87 Ohio St.3d at 397, 721 N.E.2d at 70.

### 9. Failure to object to "other acts" testimony

{¶ 169} Defendant next argues that his counsel were ineffective for failing to object to "other acts" testimony, making no argument in support and citing pages in the trial transcript that deal with the admission of defendant's knives into evidence. If any error was committed here, it had nothing to do with "other acts." The introduction of a set of defendant's knives from work showed defendant's easy access to a possible murder weapon and his familiarity with using knives. As discussed earlier, this evidence was extremely relevant, since Snipes was stabbed one hundred thirty-eight times, her throat was slit, and her hands were cut off with surgical precision. We find that counsel were not deficient by failing to object, and we reject this claim.

### 10. Failure to ensure a complete record

{¶ 170} Defendant argues that his counsel were ineffective by failing to ensure that a complete record of the proceedings was made and that, as a result, defendant has lost his chance to argue that an improper contact occurred, prompting the trial judge's admonition:

"Remember my admonitions about discussing the case with anyone else. I will also further tell you, folks, that you are not allowed to ask questions of the lawyers or speak to the lawyers, okay?

"If you have any questions, keep them in your mind, if they answer the questions for you, fine; if they don't, that's something that you can consider during your deliberations."

{¶ 171} Defendant presents no evidence of any improper contacts, and " 'without knowing what happened during those portions of the trial, we are obviously in no position to find that it was prejudicial error not to record them.' " *State v. Phillips* (1995), 74 Ohio St.3d 72, 87, 656 N.E.2d 643, 660, quoting *State v. Tyler*, 50 Ohio St.3d at 38, 553 N.E.2d at 593. Since defendant neither specifies how the trial record is incomplete nor demonstrates how he was prejudiced, his

counsel's performance cannot be characterized as ineffective assistance. See *State v. Davie* (1997), 80 Ohio St.3d 311, 332, 686 N.E.2d 245, 264; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47, 67. Therefore, we reject this claim.

{¶ 172} In summary, since none of defendant's claims establishes ineffective assistance of counsel, we find that proposition VII lacks merit.

### *Constitutional issues*

{¶ 173} In proposition of law XI, defendant challenges the constitutionality of the proportionality review that this court conducts in capital cases. However, his claims are without merit. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Smith*, 80 Ohio St.3d at 118, 684 N.E.2d at 694.

{¶ 174} In proposition of law XIII, defendant disputes the constitutionality of Ohio's death penalty statute. We reject these claims. See *State v. Carter*, 89 Ohio St.3d at 607, 734 N.E.2d at 357-358; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009, 1023; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 175} Defendant also challenges the Ohio Constitution's requirement of a direct appeal from the trial court to the Ohio Supreme Court if the death penalty was imposed. We find that this claim also has been resolved. See *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668, paragraph one of the syllabus; *State v. Clemons*, 82 Ohio St.3d at 454, 696 N.E.2d at 1023.

{¶ 176} Further, defendant's claim that Ohio's death penalty violates international treaties lacks merit. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484, 499; *State v. Phillips*, 74 Ohio St.3d at 103-104, 656 N.E.2d at 671.

***Sentencing opinion/Failure to comply with R.C. 2929.03(F).***

{¶ 177} In proposition of law IX, defendant argues that the trial court's sentencing opinion failed to explain, as required by R.C. 2929.03(F), why the aggravating circumstance outweighed the mitigating factors.

{¶ 178} In its opinion, the trial court stated that "the emphasis was on seeking, identifying and evaluating factors in mitigation of the death sentence, pursuant to R.C. 2929.04(B)." The trial court listed and considered the mitigating factors defendant presented during the penalty phase of the trial. "Having reviewed all the evidence, and the material presented in mitigation, the Court found [that] the aggravating circumstances did outweigh any factors presented in mitigation in this case."

{¶ 179} Defendant complains that the trial court did not explain *how* it determined that the aggravating circumstance outweighed the mitigating circumstances. The trial court should have presented an explanation. However, the court set forth the mitigating factors in detail, evidencing its consideration of defendant's evidence in making its decision. There is "no requirement" that the trial court explain "how it decides how much weight to give to any one factor. The weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker." *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 245, 714 N.E.2d 867, 880.

{¶ 180} Furthermore, our independent reassessment of the sentence will eliminate the effect of any deficiencies found in the trial court's sentencing decision. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131. For these reasons, we reject proposition IX.

***Weighing and determination of the death penalty***

{¶ 181} In proposition of law X, defendant argues that his death penalty must be vacated because the aggravating circumstance does not outweigh the

mitigating circumstances. We will address defendant's argument when we independently review defendant's death sentence.

### *Independent Sentence Evaluation*

{¶ 182} *Aggravating circumstance*. Defendant was convicted of the felony murder (kidnapping) aggravating circumstance under R.C. 2929.04(A)(7).

{¶ 183} The evidence against defendant included defendant's admissions linking him to the crime and the crime scene, his clandestine 911 calls notifying the police of the murder, his destruction of evidence at the crime scene, his derogatory comments about the victim (*e.g.,* "psycho bitch" and "she got what she deserved"), the presence of Snipes's watch and defendant's bloody tee-shirt at his apartment, Hoffman's testimony that defendant discussed cutting off a victim's hands to eliminate evidence, and defendant's jailhouse confession. Forensic evidence showing defendant's guilt included fingerprint evidence and expert testimony that the blood patterns on defendant's tee-shirt were applied by a long-bladed knife.

{¶ 184} Evidence establishing kidnapping included the victim's bound and gagged body at the crime scene and medical testimony that the victim was still alive when she was tied to her bed with a pair of pantyhose. Thus, the evidence in the case clearly established, beyond a reasonable doubt, that defendant intentionally murdered Snipes while kidnapping or attempting to kidnap her.

{¶ 185} *Mitigation evidence*. Defendant called two mitigation witnesses, his sister and his aunt.

{¶ 186} According to Rhea Wolpert, the defendant's sister, defendant experienced a turbulent childhood. His mother divorced his stepfather when defendant was four, and defendant moved from Wisconsin to California with his mother and her boyfriend, Ralph. Defendant had difficulty adjusting socially and doing well in school in California. After a few years in California, defendant was sent to Arizona to live with his Aunt Arletta. Aunt Arletta was described as a stable

influence in Hartman's life. Later, defendant moved to New Mexico to live with his natural father.

{¶ 187} Defendant returned to California to live with his mother when he was fourteen. While living in California, he started having problems with street kids and experimenting with alcohol.

{¶ 188} Defendant moved to Wolpert's residence in Akron when he was seventeen or eighteen. Defendant worked at factory jobs, paid Wolpert rent, and contributed to his share of the bills. According to Wolpert, defendant occasionally had problems drinking alcohol and indicated that there is a family history of alcoholism.

{¶ 189} When defendant was eighteen, he returned to California. He completed a program at a youth home in California, and later moved with his mother to Wisconsin, and then to Akron.

{¶ 190} Arletta Hartman, the defendant's aunt, stated that when defendant was eight, he was sent to live with her because of his disciplinary problems. She was a teacher on a Navajo Indian reservation in Arizona, and defendant was enrolled in a Catholic school on the reservation. She described defendant as a very good and kind boy, but hyperactive. Defendant had problems in school and repeated third grade but his grades improved and he was a "strong B student" in fourth grade.

{¶ 191} Defendant lived with his aunt for three and one-half years. However, defendant started having problems in school and was rebellious, and he was sent to live with his natural father at age twelve. Defendant's stepmother was very strict; he started running away from home, and defendant was placed into a juvenile center for theft.

{¶ 192} Ultimately, defendant moved back to his mother's home in California. When he was fourteen or fifteen, defendant spent time in a youth home for car theft and alcohol abuse. Later, defendant illegally left the youth home and

went to live with his sister in Akron. Defendant later returned to California, turned himself into authorities, and finished his time at the youth home. Thereafter, he returned with his mother to live in Ohio.

{¶ 193} In proposition of law X, defendant argues that the aggravating circumstance does not outweigh the mitigating factors. Defendant argues that his youth (twenty-three at the time of the offense), lack of significant criminal history (five or six convictions for driving under the influence), and the influence of alcoholism on his life should be considered.

{¶ 194} Defendant indicates that his substance and alcohol-abuse problems began at age eleven. Thereafter, he was intermittently homeless and lived on the streets in California, where he used alcohol, marijuana, and other drugs heavily. Defendant says that this pattern of abuse continued through his later teenage years and into his early adult life. He would typically consume a twelve-pack of beer a night, smoke marijuana, and use other drugs, and he was clinically diagnosed "as chemically dependent for alcohol and drugs."

{¶ 195} Defendant argues that there are ten important mitigating factors warranting reversal of his death sentence: (1) his family history of alcoholism, (2) hyperactivity and attention deficits contributing to his adjustment problems, (3) his unstable home environment, (4) difficulty in adjusting to different locations and cultures (*i.e.*, living on a Navajo Indian reservation), (5) failure to develop childhood trust and emotional bonding, (6) heavy involvement with alcohol and drugs as a youth, (7) alcohol overdose at age twelve, (8) multiple encounters with the criminal justice system, typically involving substance abuse, (9) worsening alcohol dependence as an adult and multiple DUIs, and (10) recent stability as evidenced by his employment as a chef and moving in with his mother to share expenses. Moreover, defendant claims that there is little in his background indicating that he could have or did commit this crime. Also, he claims that there is nothing to suggest that he would commit this type of crime in the future.

{¶ 196} Defendant argues that he can remain a productive member of society within the prison environment. By remaining drug- and alcohol-free in prison, defendant claims that he can show his true side: "kind, caring, compassionate, friendly, and industrious."

{¶ 197} Defendant expressed his sorrow about Snipe's death but continued to profess his innocence.

### Sentence evaluation

{¶ 198} We find that the evidence proves beyond a reasonable doubt that defendant committed the aggravating circumstance with which he was charged, *i.e.*, murder during kidnapping, R.C. 2929.04(A)(7).

{¶ 199} We find nothing in the nature and circumstances of the offense to be mitigating. Snipes was gagged and forcefully tied to her bed with a pair of pantyhose and then brutally murdered. The facts show a senseless, horrific murder that lacks any mitigating circumstances.

{¶ 200} Defendant's history and background provide only modest mitigating features. Nevertheless, defendant's childhood was turbulent, as he lived with a succession of relatives and parents in different parts of the country. Moreover, alcohol problems were a part of his family's history and defendant's alcohol and substance abuse began at age eleven. Defendant's alcohol dependency undoubtedly contributed to his criminal activity (thefts) and numerous DUI convictions. Despite these difficulties, defendant was gainfully employed and appears to have been a hard worker.

{¶ 201} We find that the R.C. 2929.04(B)(4) mitigating factor (youth of the offender) applicable but entitled to little weight, since defendant was twenty-three years of age at the time of the offense. See *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988, 998; *State v. Ballew* (1996), 76 Ohio St.3d 244, 257, 667 N.E.2d 369, 382.

{¶ 202} We conclude that the R.C. 2929.04(B)(5) mitigating factor (lack of a *significant* criminal history) may be applicable but entitled to little weight, since defendant had at least five previous DUI convictions. See *State v. D'Ambrosio*, 73 Ohio St.3d at 145, 652 N.E.2d at 714 (lack of significant prior criminal record entitled to some weight despite two previous DUIs).

{¶ 203} In summary, defendant's mitigation is only modest. His youth (age twenty-three), his employment history, see *State v. Madrigal*, 87 Ohio St.3d at 400, 721 N.E.2d at 72, as well as his lack of a significant prior criminal record (although he committed at least five DUIs), merit some consideration. Also, we accord only modest weight in mitigation to defendant's dysfunctional family background, his family's history of alcohol abuse, and his short record of gainful employment. Defendant's alcohol use undoubtedly affected his judgment and may have played a role in the murder. However, there was no testimony that he was heavily intoxicated before the murder or that alcohol somehow significantly reduced his ability to control his actions that night so as to negate specific intent. Overall, the mitigating factors are of modest significance, and we find that they are outweighed by the aggravating circumstance.

{¶ 204} We find that the death penalty imposed for aggravated murder of Snipes is appropriate when compared with other kidnapping-murder cases. See *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369; *State v. Joseph,* 73 Ohio St.3d 450, 653 N.E.2d 285; *State v. Simko*, 71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Fox*, 69 Ohio St.3d 183, 631 N.E.2d 124; *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464; and *State v. Brewer* (1990), 48 Ohio St.3d 50, 549 N.E.2d 491.

{¶ 205} Accordingly, we affirm defendant's convictions and sentence of death.

*Judgment affirmed*.

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment.

PFEIFER, J., dissents.

_____

**PFEIFER, J.**, **dissenting.**

{¶ 206} In *State v. Maurer* (1984), 15 Ohio St.3d 239, 243, 15 OBR 379, 383, 473 N.E.2d 768, 775, this court stated that "prolonged restraint, secretive confinement, or significant movement apart from that involved in the underlying crime [are required] in order to justify the application of the aggravating circumstance of kidnapping under R.C. 2929.04(A)(7)." In this case, the alleged kidnapping was in reality a series of actions that were incidental to the crime of murder. The sad truth is that it is easier to stab someone over one hundred times if the victim can't evade you. The majority places great weight on the fact that the victim was tied up before she was killed. The sad truth is that there was no reason to tie up the victim after she was dead.

{¶ 207} The record does not contain proof beyond a reasonable doubt that a kidnapping occurred. It is possible to believe that a kidnapping occurred; our system of justice requires more. Without the kidnapping felony-murder specification, this case is a murder case, not a capital murder case. Despite the grisly nature of the crime, that is what it should be. I would reverse the kidnapping conviction and felony-murder conviction and vacate the sentence of death. I dissent.

_____

APPENDIX

{¶ 208} "Proposition of Law No. I: The state failed to introduce sufficient evidence to prove all of the elements of kidnapping beyond a reasonable doubt. Appellant Hartman was deprived of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

{¶ 209} "Proposition of Law No. II: The trial court committed constitutional, reversible error when it instructed the jury during the penalty phase of the proceedings.

{¶ 210} "Proposition of Law No. III: The trial court erred when it permitted highly prejudicial, nonprobative and irrelevant evidence and testimony to be introduced at the trial.

{¶ 211} "Proposition of Law No. IV: Computer generated digital enhancement of fingerprints is not a reliable technic [*sic*] for analyzing fingerprints. Admission of testimony at trial regarding computer enhanced fingerprints denied appellant Hartman a fair trial and due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 212} "Proposition of Law No. V: It was error for the trial court to admit the opinion of witnesses who had not first been qualified as an expert.

{¶ 213} "Proposition of Law No. VI: Persistent and pervasive prosecutorial misconduct prejudicially affected the appellant's constitutional rights and requires reversal of his conviction and death sentence.

{¶ 214} "Proposition of Law No. VII: Defense counsel's repeated acts and ommissions [*sic*] deprived appellant of effective assistance of counsel as guaranteed by the Sixth, Eight [*sic*], and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10, and 16 of the Ohio Constitution.

{¶ 215} "Proposition of Law No. VIII: Gruesome, prejudicial and cumulative photographs were admitted into evidence even though there [*sic*] prejudicial effect outweighed there [*sic*] probative value in violation of the Sixth, Eighth and Fourteenth Amenments [*sic*] to the United States Constitution.

{¶ 216} "Proposition of Law No. IX: The trial court erred when it failed to comply with the requirements of R.C. § 2929.03(F). The trial court's opinion is constitutionally defective and no independent review can cure tehse [*sic*] fatal flaws.

{¶ 217} "Proposition of Law No. X:  The death sentence in this case must be vacated because the aggravating circumstance does not outweigh the mitigating circumstances and the sentence of death is not appropriate.

{¶ 218} "Proposition of Law No. XI:  The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code 2929.05.

{¶ 219} "Proposition of Law No. XII:   The trial court committed prejudicial, reversible error when it failed to instruct the jury of an essential element of the kidnapping specification.

{¶ 220} "Proposition of Law No. XIII:   Ohio's death penalty law is unconstitutional.   The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme.  Ohio Rev.Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Brett Hartman."

_____

*Sherri Bevan Walsh,* Summit County Prosecuting Attorney, *Paul M. Maric* and *Philip D. Bogdanoff,* Assistant Prosecuting Attorneys, for appellee.

*Irving B. Sugerman* and *Nathan A. Ray,* for appellant.

_____