DECISION AND JUDGMENT ENTRY
This is an appeal from a Ross County Common Pleas Court judgment of conviction and sentence. The jury found Joseph L. Swain, Jr., defendant below and appellant herein, guilty of three offenses: (1) felonious assault, in violation of R.C. 2903.11; (2) endangering children, in violation of R.C. 2919.22(B)(1); and (3) endangering children, in violation of R.C. 2919.22(A).
Appellant raises the following assignments of error for review:
FIRST ASSIGNMENT OF ERROR:
 "THE JURY VERDICT BELOW WAS BASED UPON INSUFFICIENT EVIDENCE TO CONVICT APPELLANT OF THE CRIMES CHARGED AND THUS VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL."
SECOND ASSIGNMENT OF ERROR:
 "THE JURY VERDICT BELOW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THUS VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL."
THIRD ASSIGNMENT OF ERROR:
 "THE COURT BELOW ERRED BY NOT GRANTING APPELLANT'S MOTION FOR A MISTRIAL BASED UPON TRIAL PUBLICITY THROUGH RADIO BROADCASTS HEARD BY THE JURY AND OTHER IRREGULARITIES WITH THE JURY."
FOURTH ASSIGNMENT OF ERROR:
 "THE COURT BELOW ERRED BY ALLOWING IMPROPER CLOSING ARGUMENTS BY THE STATE'S ATTORNEY."
FIFTH ASSIGNMENT OF ERROR:
 "THE COURT BELOW ERRED BY ALLOWING EXPERT OPINION TESTIMONY THAT EXCEEDED THE SCOPE OF THE WITNESSES' PURPORTED EXPERTISE."
SIXTH ASSIGNMENT OF ERROR:
 "THE COURT BELOW ERRED BY ALLOWING CUMULATIVE EXPERT OPINION AND FACT TESTIMONY."
SEVENTH ASSIGNMENT OF ERROR:
 "THE COURT BELOW ERRED BY NOT COUNTING THE APPELLANT'S JAIL TIME CREDIT IN THE JUDGMENT ENTRY OF SENTENCE."
Our review of the record reveals the following relevant facts. On November 23, 1999, Deanna Fulks[1] gave birth to twin boys, Damien and Dorian. Appellant is the father of the two boys. Fulks and appellant are not married and they do not live together. When the boys first were born, Fulks, the twin boys, and her four-year old daughter lived with Fulks' mother. Appellant helped Fulks care for the children.
On December 7, 1999, Damien was treated at an urgent-care center for burns on his right hand fingers. Appellant told Ross County Children Services Caseworker Robin Watts that while he was removing hot water from the microwave, he accidentally spilled hot water on Damien's fingers.
On December 8, 1999, Fulks took Damien to Dr. Bogushluwa Hyziak, his well-care physician, for a follow-up visit regarding his burns. Hyziak requested Fulks to bring Damien in every two days for a re-dressing of his burns.
On December 12, 1999, another doctor in Dr. Hyziak's practice saw Damien. The doctor noticed significant swelling and puffiness on Damien's left hand.
Dr. Hyziak saw Damien on December 13, 1999 and noticed that his left hand still was significantly swollen. She also noticed a tiny bruise on his hand. Hyziak requested an x-ray of Damien's left hand. The x-ray was negative for broken bones.
Dr. Hyziak stated that during the visit, Fulks informed Hyziak that Damien had a crack on his toe. Hyziak observed the crack and noticed that it was "very deep." Hyziak stated that Fulks explained that the crack occurred while she was bathing Damien. Hyziak stated that the cracked skin probably resulted from "traumatic pressure" placed on the toe.
On December 14, 1999, Dr. Hyziak again saw Damien. She saw nothing unusual during the visit.
On December 17, 1999, at approximately 9:30 a.m., Dr. Hyziak again saw Damien. During the visit she noticed swelling on Damien's right foot. She also stated that Damien's right leg was significantly swollen. She stated that she could tell that the leg was broken simply by touching Damien's leg — she could "practically [feel the] bone moving."
Dr. Hyziak asked Fulks what had happened and Fulks replied that she had not observed anything that could have caused the swelling. Hyziak stated the Fulks told her that the previous day, appellant had cared for Damien. Damien reportedly had cried most of the day while he was with appellant. Dr. Hyziak became concerned that Damien was being abused. She stated:
 "Although I was given an explanation that the father opened the microwave, got out a cup of hot water and it splashed on him and on the baby's hand, then the swelling on the left hand a few days later, four days later there was significant swelling on his left hand, which we could not explain and at that time I was just concerned that . . . . to be certain that I'm not missing something."
On December 17, 1999, Damien was transferred to Children's Hospital in Columbus. Dr. Jennifer Chapman, an emergency department doctor, examined Damien. Chapman discovered that Damien had a broken femur and five other broken bones, including two broken wrists, two broken ankles and a broken end of his right thigh bone.
On April 14, 2000, the Ross County Grand Jury returned an indictment charging appellant with one count of felonious assault and two counts of endangering children.
On January 8 and 9, 2001, the trial court held a jury trial. Dr. Hyziak opined that Damien's injuries resulted from abuse. She stated that "a femur bone is a fairly strong bone and it take significant force to break that bone [sic]." She thought that the injury to Damien's leg probably occurred a day or two before she discovered it. She stated that due to the amount of swelling, the injury probably occurred within a day or two. She does not know how the injury was caused, but stated that the injury would require a significant amount of force.
Dr. Chapman explained that Damien's broken femur was classified as a transverse fracture, which means a break in the middle of the bone and that the break results when a force is applied right where the fracture is. Chapman stated that the other five fractures were "corner fractures or bucket handles fractures." She stated that corner fractures occur at the ends of a bone and that the fractures in a baby are caused by "just really violent shaking to break the bone, to kind of pull the end of the bone away from the main part of the bone."
Dr. Chapman stated that she excluded the vaginal delivery as a cause of Damien's broken bones. She explained that because Damien was delivered approximately three weeks earlier, the x-rays would have revealed evidence of healing. She stated, however, that because the x-rays did not reveal evidence of healing, the injury that caused the broken bones occurred seven to ten days prior to their discovery.
Like Dr. Hyziak, Dr. Chapman also became concerned that Damien was an abused child. She stated she and the other doctors who examined Damien became concerned because no explanation existed why this newborn child had multiple fractures. Chapman stated that multiple fractures do not occur spontaneously in a newborn: A "non-moving three week old cannot sustain a femur fracture from his own activities." Dr. Chapman stated that she "absolutely" believes that Damien's injury resulted from child abuse.
Dr. Charles F. Johnson, a pediatrics professor at Ohio State University and the director of the child abuse program at Children's hospital, explained that sometimes he is asked to consult with the other doctors to determine whether a child has been abused. In Damien's case, however, he was not consulted. Johnson stated that he is not asked to consult when the diagnosis of abuse is apparent.
As one of the state's expert witnesses, Dr. Johnson explained that when Damien's femur broke, it would have been painful. He stated that the swelling could occur over time and that sometimes swelling is not apparent for hours afterward. Dr. Johnson opined that Damien's injury must have occurred either on December 15 or December 16.
At trial, Fulks testified that she believed that Dr. Hyziak's manipulation of Damien's leg during his December 17, 1999 well-care examination caused his femur to break. Fulks stated that she did not notice any injury in the morning when she dressed Damien. She further stated that no swelling was present when she went into the doctor's office.
Fulks explained her version of the events leading up to the discovery of Damien's injuries. She stated that she was with Damien and appellant on December 15, 1999, and that on December 16, 1999, she had been in Columbus with Damien's twin brother. She left around 7:00 a.m. returned home around 6:00 or 6:30 p.m. Fulks stated that she left Damien in appellant's care. Fulks claimed that appellant took Damien to appellant's mother's house and that while there, he and Damien also visited with one of appellant's sisters.
Fulks stated that when she arrived home from Columbus, appellant and Damien were not there. She called appellant's mother's house and told appellant that he could bring Damien home. She testified that appellant brought Damien home around 7:00 p.m. Fulks stated that appellant remained at her home for a while and then left between 10:00 p.m. and 12:00 a.m. She stated that appellant did not have contact with Damien after she put him to bed.
Fulks stated that when she put Damien to bed between 9:00 p.m. and 10:00 p.m., Damien appeared fine. She stated that Damien slept until about 3:00 a.m., when she fed him. She stated that Damien went back to sleep until 7:30 or 8:00 a.m.
Fulks stated that she did not cause Damien's injuries and that she does not know who injured the child. Fulks explained that while she and appellant were at Children's Hospital, she spoke with Chillicothe Police Detective James E. Lowe. She testified that she told the detective that she left Damien in appellant's care the day before. She stated that she did not tell Detective Lowe that appellant was with his mother and his sister for part of the day, because she did not realize that it was important to do so. She stated that no matter who he was with, she considered appellant responsible for Damien.
Diane J. Luckett, Fulks' mother, testified that when she arrived home on December 16, 1999, appellant and Damien were not present. She stated that appellant and Damien arrived home shortly after she did. She stated that she saw nothing unusual about Damien. Luckett stated that Fulks put Damien to bed around 9:00 p.m. and that appellant left around 11:00 or 11:30 p.m.
Luckett stated that she was in the house the next morning and fed Dorian a bottle before she went to work at around 8:30 a.m. She explained that she was running late because she was helping Fulks get ready for her trip to Columbus.
On cross-examination, the prosecutor asked Luckett whether the events she described during her direct examination referred to the day before Fulks went to Columbus (December 15, 1999) or the day before Fulks went with Damien to the doctor (December 16, 1999). Luckett stated that she must have misunderstood the question. She clarified that she was discussing the events of the day before Fulks went to Columbus. Luckett stated that on the day Fulks went to Columbus, Luckett left for work between 8:00 and 8:30 a.m. and that she returned home around 9:00 pm. She stated that when she returned home, one of the twins was in bed and one still was awake. She stated that she did not spend any time with the children that evening.
Detective Lowe testified that he spoke with Fulks and appellant at the hospital in Columbus. Appellant told Lowe that he watched Damien on December 16, 1999 and that he put Damien in bed before Fulks returned from Columbus. Detective Lowe stated that appellant explained to him how Damien's injuries could have occurred. Appellant told the detective:
 "[H]e had been playing with [the child], had him on the floor, when he had him on the floor he stated that he would put his fingers out like this and [the child] would grab his fingers and he would pull [the child] up with his fingers like that, with [the child] holding onto him. [sic]"
Thus, appellant told the detective that maybe his pulling the child up caused the child's injuries to his wrists.
Dr. Hyziak testified, however, that a child of Damien's age cannot reach, cannot lift his head, cannot grab an adult's fingers, and cannot pull the body up. Hyziak stated: "You can manipulate the baby to grab the baby's hands and try to pull the baby up yourself. But not baby himself doing the raising."
Dr. Chapman stated that a newborn's wrists would not break if an adult were to hold the newborn's wrists and pull the child up, as appellant claimed. She stated that if the newborn grabbed onto an adult's fingers, the adult pulling the newborn up would not cause the wrists to break. She stated that such an action does not involve enough force to cause the bones to break.
Appellant also told the detective that he burned the child's fingers when taking hot water out of the microwave. The detective noticed, however, that appellant did not have any burn marks where the detective thought they would be if appellant's story were true. Detective Lowe also stated that appellant did not indicate whether he had left home at any point on December 16, 1999.
In his defense, appellant presented the testimony of Dr. Marvin E. Miller, a pediatrics professor. Miller stated that he believed that Damien suffered from temporary brittle bone disease (TBBD). Miller admitted that TBBD is a controversial theory and that presently he is the only person in the United States writing about the topic as a recognizable disease. Miller stated that a child with TBBD is more likely to receive fractures as a result of normal activities, such as "changing of clothes, the changing of diapers, picking the child up from a car seat to place him on a table or a bed."
All three of the state's experts discounted TBBD as a legitimate theory. Dr. Hyziak stated that brittle bone disease (BBD), as opposed to TBBD, is a genetic disease. She explained that Children's Hospital checked Damien for BBD and that a genetics specialist determined that Damien did not suffer from BBD. Dr. Chapman testified that the American Academy of Pediatrics does not recognize TBBD. Dr. Johnson stated that American Academy of Pediatricians child abuse section looks at TBBD as an "unproven theory."
On January 10, 2001, the jury found appellant guilty as charged. Appellant filed a timely notice of appeal.
 I
In his first assignment of error, appellant asserts that the record contains insufficient evidence to support his convictions. Appellant argues that insufficient evidence exists on "nearly every essential element of felonious assault." Appellant contends that no evidence exists that he caused the injuries and that no evidence exists that he acted "knowingly."
With respect to the burns, appellant argues that "not a shred of evidence in the record [exists] to show" recklessness. Appellant argues that his statement that he accidentally spilled hot water on the child is the only evidence regarding the origin of the burns. Appellant contends that "[a] mere accident does not rise to the level of recklessness."
Appellant further asserts that the circumstantial evidence fails to establish beyond a reasonable doubt that he was the perpetrator of the abuse. In support of his argument, appellant cites State v. Miley
(1996), 114 Ohio App.3d 738, 684 N.E.2d 102, for the proposition that when the testimony in a child abuse case indicates that a defendant was one of two care givers, the evidence is insufficient to prove the elements of felony child endangering. Appellant argues that the evidence in the case at bar shows that other relatives "spent significant time" with the child.
The state asserts that sufficient evidence exists to prove that appellant caused the abuse. The state notes that (1) on the day prior to the discovery of Damien's injuries, evidence exists to support a finding that the child was alone with appellant; (2) the child cried most of the day while in appellant's care; (3) appellant put the child to bed by the time Fulks returned home; (4) appellant's innocent explanations do not mean that he did not possess the required culpable mental state; and (5) the jury was free to reject appellant's innocent explanations. We agree with the state that sufficient evidence supports appellant's convictions.
Initially, we note that appellant failed to renew his Crim.R. 29(A) motion for judgment of acquittal at the close of all the evidence. A defendant who is tried before a jury and brings a Crim.R. 29(A) motion for acquittal at the close of the state's case waives any error in the denial of the motion if the defendant puts on a defense and fails to renew the motion for acquittal at the close of all the evidence. Miley,supra. See, also, State v. Roe (1989), 41 Ohio St.3d 18, 25,535 N.E.2d 1351, 1360; State v. Hicks (Dec. 29, 1997), Ross App. No. 2292, unreported.
Assuming, arguendo, that appellant had properly raised his Crim.R. 29(A) motion, we would find sufficient evidence to uphold appellant's conviction. A trial court may order a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim.R. 29(A). A trial court shall not enter a judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether the state has established, beyond a reasonable doubt, each essential element of the offense. See, e.g., Statev. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
When an appellate court reviews a trial court's decision to overrule a motion for judgment of acquittal, the reviewing court focuses on the sufficiency of the evidence. See, e.g., State v. Carter (1995),72 Ohio St.3d 545, 553, 651 N.E.2d 965, 974; State v. Jenks (1991),61 Ohio St.3d 259 at 273, 574 N.E.2d 492, 503. When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. See State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541,546 (stating that "sufficiency is the test of adequacy"); Jenks,61 Ohio St. 3d at 273, 574 N.E.2d at 503. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; Jenks,61 Ohio St. 3d at 273, 574 N.E.2d at 503. Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."Thompkins, 78 Ohio St.3d at 390, 678 N.E.2d at 549 (Cook, J., concurring).
When reviewing the sufficiency of the evidence, appellate courts construe the evidence in a light most favorable to the prosecution. SeeState v. Hill (1996), 75 Ohio St.3d 195, 205, 661 N.E.2d 1068, 1079;State v. Grant (1993), 67 Ohio St.3d 465, 477, 620 N.E.2d 50, 64-65;State v. Rojas (1992), 64 Ohio St.3d 131, 139, 592 N.E.2d 1376, 1384. Reviewing courts will not overturn convictions on sufficiency of evidence claims unless reasonable minds could not reach the conclusion reached by the trier of fact. See State v. Tibbetts (2001), 92 Ohio St.3d 146749 N.E.2d 226; State v. Treesh (2001), 90 Ohio St.3d 460, 739 N.E.2d 749.
Employing the above standard, we believe that in the case sub judice
the state presented sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that appellant committed the offenses of endangering children and of felonious assault. Thus, the trial court did not err by overruling appellant's Crim.R. 29(A) motion for judgment of acquittal.
In the case at bar, appellant was convicted of three offenses: (1) child endangering (R.C. 2919.22(A)); (2) child endangering (R.C.2919.22(B)(1)); and (3) felonious assault (R.C. 2903.11). R.C. 2919.22(A) sets forth the essential elements of the crime of child endangering as follows:
 No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * * *
Thus, a successful R.C. 2919.22(A) conviction requires the state to prove that: (1) a person having custody or control over (2) a child under eighteen years of age (3) recklessly created a substantial risk to the health or safety of the child (4) by violating a duty of care, protection, or support. See State v. McGee (1997), 79 Ohio St.3d 193,680 N.E.2d 975, syllabus. R.C. 2901.01(A)(8)(8) defines a "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.22(C) defines "recklessly" as follows:
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
R.C. 2919.22(B)(1) sets forth the essential elements of the offense of endangering a child as follows: "No person shall * * * abuse the child." A successful R.C. 2919.22(B)(1) conviction requires the state to prove beyond a reasonable doubt: (1) that the child is under eighteen years of age; (2) an affirmative act of abuse occurred; and (3) that the defendant recklessly committed the act of abuse. See State v. Ivey (1994),98 Ohio App.3d 249, 257, 648 N.E.2d 519, 525; see, also, McGee, supra;State v. Burdine-Justice (1998), 125 Ohio App.3d 707, 713, 709 N.E.2d 551,555. To establish an affirmative act of abuse, the state must show that the defendant committed "an act which inflicts serious physical harm or creates a substantial risk of serious harm to the physical health or safety of the child." Ivey, 98 Ohio App.3d at 257, 648 N.E.2d at 525;Burdine-Justice, 125 Ohio App.3d at 714, 709 N.E.2d at 555. The Revised Code defines "serious physical harm" as follows:
 (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 (b) Any physical harm that carries a substantial risk of death;
 (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
R.C. 2901.01(A)(5).
R.C. 2903.11(A)(1) sets forth the essential elements of felonious assault: "No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn." R.C. 2901.22(B) defines when a person acts "knowingly":
 A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
We note that an offense's elements may be established by direct evidence, circumstantial evidence, or both. See State v. Durr (1991),58 Ohio St.3d 86, 568 N.E.2d 674. Circumstantial and direct evidence are of equal evidentiary value. See Jenks, 61 Ohio St. 3d at 272,574 N.E.2d at 502 ("Circumstantial evidence and direct evidence inherently possess the same probative value [and] in some instances certain facts can only be established by circumstantial evidence."). When reviewing the value of circumstantial evidence, we note that "the weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." Wesley v. The McAlpin Co. (May 25, 1994), Hamilton App. No. C-930286, unreported (citing Donaldson v. NorthernTrading Co. (1992), 82 Ohio App.3d 476, 483, 612 N.E.2d 754, 759).
Based upon our review of the record in the case at bar, we believe that the jury had before it sufficient evidence from which to conclude, beyond a reasonable doubt, that appellant committed the offenses. First, with respect to the R.C. 2919.22(A) conviction, we conclude that the evidence reveals that appellant burned Damien's fingers. Appellant claimed that he caused the burns by accident and that no evidence of recklessness exists. The jury, however, heard both parties' evidence and arguments and was free to reject appellant's claim.
Second, we conclude that sufficient evidence supports appellant's R.C.2919.22(B) conviction. Evidence exists that Damien was abused and that his injuries occurred on December 16, the day appellant cared for Damien. The doctor's detected no injuries prior to December 17. Appellant and Fulks were together on December 15. Fulks stated that she did not see who caused Damien's injuries and that she did not cause the injuries. Evidence exists that appellant was the sole caretaker during the period of time the abuse occurred. Detective Lowe testified that appellant stated he cared for Damien the day before the injuries were discovered. Appellant did not inform the detective that Damien had been in anyone else's care. Although some evidence exists that appellant was not the sole caretaker during the period of time when the abuse occurred, once again the jury was free to reject appellant's other evidence. See Statev. Sampsill (June 29, 1998), Pickaway App. No. 97 CA 17, unreported (concluding that testimony that only other caretaker did not cause injury and excluding others from causing the injury sufficient to support child endangering conviction); State v. Williams (Mar. 5, 1992), Franklin App. No. 91AP-653, unreported (sufficient circumstantial evidence to support a child endangering conviction when medical expert testimony revealed that an infant was injured as the result of abuse, and when the defendant was the primary caretaker of the infant immediately preceding the manifestation of the infant's injuries).
Third, we conclude that sufficient evidence exists to establish the essential elements of felonious assault. Appellant does not dispute the serious physical harm element. Instead, appellant argues that no evidence exists that he caused the injuries. As noted above, however, the record contains evidence that appellant caused the injuries. Moreover, although appellant claims that he did not knowingly cause any injuries, again, the jury heard the parties' evidence and counsels' arguments and was free to reject appellant's claims of innocence. The jury was free to reject appellant's claim that he caused the broken wrists by playing with the child. At least two doctors testified that appellant's theory was medically meritless.
We disagree with appellant's argument that Miley requires a different conclusion. In Sampsill, we considered a similar argument that Miley
required a reversal of a child endangering conviction:
 "This case is distinguishable from Miley, where we held that there was insufficient evidence that Miley, the child's primary care-giver, had caused the child's death. The state argued that the child had been abused and that Miley either committed the abuse or failed to prevent it from occurring since Miley cared for her at all times. Id. at 744. The doctors were unable to determine when the child sustained the injuries. The only evidence of Miley's guilt was that the child died from some type of abuse, only Miley and one other person were present during the time leading up to her death, and Miley was responsible for the child's care. In this case, Dr. Bartkowski established a fairly limited time-frame in which [the child] sustained her fatal injuries. Expert testimony supported the exclusion of the other two children in appellant's care as capable of causing the injuries. The only other person present during the time-frame was [the defendant's boyfriend]. He testified that he did not injure Brittany and the jury was free to believe his testimony. Further, [the defendant] was alone with [the child] a much larger portion of the time-frame than [the boyfriend]."
We believe that the case at bar is more similar to Sampsill thanMiley. In Miley, the evidence revealed that at the time the abuse occurred, the child was in the care of more than one person. In the case at bar, however, evidence exists that at the time of Damien's injuries, appellant was the sole caretaker. See Sampsill. As we noted above, evidence exists that the injuries occurred on December 16 and, despite appellant's claims to the contrary, that appellant was the sole caretaker that day and that appellant did not take the child to visit with relatives. Additionally, appellant, like the defendant in Sampsill, was alone with the child for a substantial portion of the time-frame within which the injuries occurred.
Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II
In his second assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. Appellant asserts that the uncertainty surrounding the injuries to the child "strongly outweighed" the evidence of criminal conduct. Appellant sets forth the following "balance" of the evidence. On the state's side: (1) unexplained fractures to both ankles, both wrists, and the child's leg; (2) an explained burn to the child's fingertips; (3) three expert doctors who stated that the injuries indicated abuse; (4) periods of time when appellant played with the child and permitted the child to grab his hands and pulled the child up. On appellant's side: (1) the state's doctors stated that they did not know who caused the injuries; (2) the state's doctors admitted that they did not know if the injuries occurred at a time when appellant was with the baby; (3) the explanation for the burn injuries was accepted; (4) Dr. Miller's testimony that a medical explanation existed for the fractures; (5) Dr. Miller's opinion that TBBD caused the fractures rather than abuse; (6) Dr. Miller's opinion that the child had many specific risk factors or indicators of TBBD, such as being a twin, intrauterine confinement, premature birth, born to a diabetic mother, an objective measurement of low bone density, and otherwise unexplained multiple fractures; (7) the child was fine and underwent his normal routine the night before and the morning of the swelling to his leg; (8) Dr. Hyziak did not notice dramatic swelling to the child's leg until manipulating the leg; (9) appellant had not been around the child for about eight hours before the swelling occurred and, according to two doctors, the swelling most likely would have occurred anywhere from instantly to within a few hours of trauma to the leg; (10) appellant had been around other children without incident; and (11) no witness observed appellant harm the child and no signs exist of bruises, cuts, or other wounds.
When we consider a claim that a conviction is against the manifest weight of the evidence, the reviewing court must dutifully examine the entire record, weigh the evidence and consider the credibility of witnesses, while being mindful that credibility generally is an issue for the trier of fact to resolve. State v. Thomas (1982), 70 Ohio St.2d 79,80, 434 N.E.2d 1356, 1357; State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. Once a reviewing court has finished its examination, the court may reverse the judgment of conviction only if it appears that the fact finder, in resolving conflicts in evidence, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d at 547
(quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720-21). If the state presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, a reviewing court will not reverse the judgment of conviction as against the manifest weight of the evidence. State v. Eley (1978), 56 Ohio St.2d 169,383 N.E.2d 132, syllabus.
After our review of the record in the case sub judice, we find substantial competent, credible evidence upon which the trier of fact reasonably could conclude that the state had established, beyond a reasonable doubt, the essential elements of the offenses of which appellant was convicted. First, although the state's medical expert witnesses could not state who caused the child's injuries, as we noted under our discussion of appellant's first assignment of error, evidence exists that appellant caused the injuries. Additionally, the jury was free to reject appellant's claims that he innocently caused the injuries. Moreover, evidence existed that the child's injuries did not innocently result from appellant playing with the child.
Second, appellant's claim that Dr. Miller's testimony concerning TBBD should have caused the jury to acquit appellant is without merit. Each of the state's three medical expert witnesses stated that Miller's TBBD theory is not accepted within the medical profession. The jury, therefore, was entitled to discount Miller's testimony that the child's injuries resulted from TBBD.
Thus, we do not believe that the jury created such a manifest miscarriage of justice that we must reverse appellant's conviction. The jury was in a much better position than we, as an appellate court, to view the witnesses and observe their demeanor, gestures, and voice inflections and to weigh the credibility of the witnesses' testimony. See, e.g., State v. Dye (1998), 82 Ohio St.3d 323, 695 N.E.2d 763.
Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.
 III
In his third assignment of error, appellant argues that the trial court erred by overruling his motion for a mistrial. In particular, appellant contends that the trial court should have granted his motion for a mistrial because trial publicity improperly tainted the jury. Appellant notes that during the course of the trial, a radio broadcast included a reference to appellant's incarceration on a domestic violence charge and also included comments about the evidence and the witnesses in the trial. The state asserts that the trial court's decision did not constitute an abuse of discretion.
Initially, we note that a trial court enjoys broad discretion in ruling on a motion for a mistrial. See State v. Iacona (2001), 93 Ohio St.3d 83,100, 752 N.E.2d 9 37, 953; State v. Sage (1987), 31 Ohio St.3d 173, 181,510 N.E.2d 343, 349. Accordingly, absent an abuse of discretion, an appellate court will not reverse a trial court's decision regarding a motion for a mistrial. A trial court does not abuse its discretion by committing a mere error of law or of judgment, rather, a trial court abuses its discretion when the trial court's decision is unreasonable, arbitrary or unconscionable. See, e.g., State v. Clark (1994),71 Ohio St.3d 466, 470, 644 N.E.2d 331, 335; State v. Moreland (1990),50 Ohio St.3d 58, 61, 552 N.E.2d 894, 898; State v. Adams (1980),62 Ohio St.2d 151, 157 404 N.E.2d 144, 149. We further note that "mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v. Franklin (1991),62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9 (citing Illinois v. Somerville
(1973), 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425, 429-430;Arizona v. Washington (1978), 434 U.S. 497, 505-506, 98 S.Ct. 824,54 L.Ed.2d 717, 728-729).
In the case sub judice, after full consideration of appellant's claim, we cannot state that the ends of justice required the trial court to declare a mistrial and that a fair trial was no longer possible after some members of the jury heard the radio broadcast. The trial court did not abuse its discretion.
The trial court questioned all of the jurors who heard the radio broadcast. All but one stated that they did not hear anything on the radio that they had not already heard in the courtroom. The trial court in fact dismissed the one juror who stated that he heard the portion of the broadcast about appellant's prior conviction. The court specifically determined that none of the remaining jurors possessed any information unduly prejudicial to appellant, other than what they had heard in the courtroom. The court stated that it was satisfied that the jury was "fair and impartial."
We disagree with appellant that the trial court should have declared a mistrial. Rather, we conclude that the trial court fully and fairly examined the jurors and took appropriate action to ensure that appellant received a fair trial, untainted by any event that occurred outside of the courtroom.
Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 IV
In his fourth assignment of error, appellant asserts that the state committed prosecutorial misconduct. In particular, appellant asserts that the prosecutor "blatantly appealed to the emotions and fears of the jury in asking them to disbelieve" Dr. Miller. Appellant argues that the following remarks constitute improper comments: (1) "[W]ould you rely upon the testimony you've heard today from . . . on Temporary Brittle Bone Disease for a diagnosis for your child or would you rely upon . . . the witnesses that the State called in this particular case"; and (2) "[I]f you had a child and that child was sick, who would you rely upon concerning that particular child." Appellant further contends that the prosecutor: (1) improperly referred to the opinions of state's doctors as a "diagnosis of an abused child"; (2) improperly mis-characterized the evidence when the prosecutor implied that appellant was the only person with the child during the potential span of time that the leg fracture occurred; and (3) improperly argued that appellant's statement to the detective that he "may have caused the injuries to his wrists" was tantamount to an admission that appellant "did this terrible deed." Appellant asserts that the "improper" remarks demonstrate impropriety of the state's closing argument and this misconduct prejudicially affected appellant's substantial rights, or, alternatively, that his counsel rendered ineffective assistance of counsel.
Initially, we note that appellant failed to object to the prosecutor's remarks. Thus, appellant has waived all but plain error. See Crim.R. 52;State v. Hartman (2001), 93 Ohio St.3d 274, 294, 754 N.E.2d 1150, 1173.
"The test for prejudice regarding prosecutorial misconduct in closing arguments is `"`whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'""Hartman, 93 Ohio St.3d at 295, 754 N.E.2d at 1173 (quoting State v.Hessler (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, 1254 and Statev. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883, 885. "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." State v. Jackson (2001), 92 Ohio St.3d 436,441, 751 N.E.2d 946, 956. To establish prejudice, an accused must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. State v. Loza (1994), 71 Ohio St.3d 61, 83, 641 N.E.2d 1082, ___ certiorari denied (1995), 514 U.S. 1120, 115 S.Ct. 1983,131 L.Ed.2d 871.
In the case at bar, we believe that appellant has failed to demonstrate that the prosecutor's allegedly improper comments prejudicially affected the outcome of the trial. The prosecutor's remarks repeated in a persuasive fashion what the evidence tended to show. The jury heard the same type of evidence during the trial that the prosecutor referred to during his closing arguments. A reasonable probability does not exist that the result of appellant's trial would have been different absent the prosecutor's allegedly improper remarks. Thus, we find no error, plain or otherwise, with regard to the prosecutor's comments. Moreover, we do not believe that counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's remarks.
Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.
 V
In his fifth assignment of error, appellant asserts that the trial court erred by allowing improper expert opinion regarding the cause of the child's injuries. Appellant claims that the state's experts' opinions leapt "from the medical evidence to social-factor or causation type evidence without any properly laid foundation or basis to do so." The state asserts that each witness was properly qualified.
Initially, we note that the admissibility of evidence is left to the sound discretion of the trial court. Accordingly, absent an abuse of discretion, a reviewing court must not reverse the trial court's decision. State v. Combs (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071;State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. Once again, an abuse of discretion implies more than an error of law or of judgment; rather, an abuse of discretion implies that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. State v. Xie (1992),62 Ohio St.3d 521, 584 N.E.2d 715; State v. Montgomery (1991),61 Ohio St.3d 410, 575 N.E.2d 167. As we earlier pointed out, when we apply the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. In re Jane Doe 1
(1991), 57 Ohio St.3d 135, 566 N.E.2d 1181 (citing Berk v. Matthews
(1990), 53 Ohio St.3d 161, 559 N.E.2d 1301).
Under Evid.R. 702, "a witness may testify as an expert if all of the following apply:"
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * * *
Courts should favor the admissibility of expert testimony when their testimony is relevant and meets the Evid.R. 702 criteria. See State v.Williams (1983), 4 Ohio St.3d 53, 57-58, 446 N.E.2d 444, 447. Moreover, "[t]he credibility of the [expert's] conclusion and the relative weight [expert testimony] should enjoy are determinations left to the trier of fact." State v. Nemeth (1998), 82 Ohio St.3d 202, 210, 694 N.E.2d 1332,1338.
"Experts may testify as to whether or not the findings from the expert's physical examination are consistent with abuse." In re Lloyd
(Apr. 16, 1996), Franklin App. Nos. 95APF11-1435, 95APF11-1436, 95APF11-1437, unreported (citing State v. Barton (1991),71 Ohio App.3d 455, 469, 594 N.E.2d 702; State v. Proffitt (1991),72 Ohio App.3d 807, 596 N.E.2d 527; see, also, State v. Gersin (1996),76 Ohio St.3d 491, 494, 668 N.E.2d 486 (stating that expert testimony on the ultimate issue of whether abuse has occurred in a particular case is helpful to jurors and is therefore admissible pursuant to Evid.R. 702 and 704). In accordance with Lloyd, we do not believe that the trial court abused its discretion by permitting the expert medical witnesses to give their opinion that the child's injuries resulted from abuse. Moreover, each witness was properly qualified as a medical expert witness. Each doctor specializes in pediatric care. Each knows what type of injuries a newborn child is capable of receiving on the child's own accord and those which can only occur as the result of abuse. We find no abuse of discretion with the trial court's decision to permit these witnesses to testify and offer evidence.
Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.
 VI
In his sixth assignment of error, appellant asserts that the trial court erred by permitting cumulative evidence regarding the cause of the child's injuries. Appellant argues that the trial court should have exercised its discretion under Evid.R. 403(B) to limit the state's ability to present the same evidence in a repetitive fashion.
The state asserts that its three expert witnesses did not present cumulative testimony. Instead, each witness presented unique testimony: (1) Dr. Hyziak testified about the child's condition through the course of several examinations; (2) Dr. Chapman testified about the nature of the child's fractures on his wrists, ankles, and femur; and (3) Dr. Johnson about TBBD as an unproven theory. We again note that the admissibility of evidence is left to the sound discretion of the trial court. Thus, absent an abuse of discretion, a reviewing court must not reverse the trial court's decision. Combs, supra; Sage, supra. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. In re JaneDoe 1, supra.
In the case sub judice, we find no error with the trial court's decision to permit the three expert witnesses to testify. The witnesses' testimony was not a mere recitation of each other's expert opinion. Rather, each witness conveyed to the trier of fact particular and useful information to help understand the nature of the child's injuries, and that the injuries resulted from abuse.
Moreover, Evid.R. 403(B) provides as follows:
 (B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
"Evid.R. 403(B) does not require exclusion of cumulative evidence. The court has discretion to admit or exclude it." State v. Campbell (1994),69 Ohio St.3d 38, 51, 630 N.E.2d 339, 352.
Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error.
 VII
In his seventh assignment of error, appellant asserts that the trial court erred by failing to properly credit appellant's sentence with time already spent in jail. We disagree with appellant.
Our review of the trial court's sentencing entry, as it appears in the record presented to this court[2], credits appellant's sentence with twenty days. Thus, it appears that the trial court did in fact award appellant credit for time served in jail.
Accordingly, based upon the foregoing reasons, we overrule appellant's seventh assignment of error and affirm the trial court's judgment.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.
The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kline, J. Evans, J.: Concur in Judgment Opinion.
[1] Appellant states in his brief that the proper spelling of Deanna's last name is "Fowlkes," but that the record consistently uses the spelling of "Fulks." We use the spelling as it appears throughout the record.
[2] We note that the copy of the trial court's judgment entry attached to appellant's brief fails to credit appellant's sentence. As we point out above, however, the judgment entry included in the court file does include a jail credit.